ELIZABETH A. CHILDS *vs.* JOHN W. CHILDS.

*Divorce—Complainant must not have been the cause of the
ground of complaint—What constitutes Cruelty as a ground
of Divorce—Abandonment.*

A party cannot successfully solicit relief by divorce from ill treatment which
is the result of his own misconduct, without first, at least, seeking a remedy
in the reform of his own manners.

Cruelty of one of the parties to the marriage relation releases the other from
the duty of cohabitation, but the causes of separation on this account should
be grave and weighty, and such as show an absolute impossibility that the
duties of the married life can be properly discharged.

The rule *per quod consortium amittitur* is but an inadequate test, for it still
remains to be inquired what conduct ought to produce that effect? whether
the *consortium* is reasonably lost? and whether the party quitting has not
too hastily abandoned the *consortium?*

Mere turbulence of temper, petulance of manners, infirmity of body or mind,
are not numbered amongst those causes.

Where a husband by his misconduct induces such behaviour on the part of the
wife as would be just cause of complaint but for his own misconduct, and
without first seeking a remedy in the reform of his own conduct, separates
from his wife and after the separation is forbidden by her to return again to
her, such act of the wife forbidding the husband to return will not entitle
the husband to a divorce on the ground of abandonment.

APPEAL from the Circuit Court of Baltimore City.

The case is stated in the opinion of the Court.

The cause was argued before BARTOL, C. J., BOWIE,
STEWART, GRASON and MILLER, J., for the appellant and
submitted for the appellee.

*Wm. Shepard Bryan* and *John W. Skipper*, for the appellant.

*R. Emmett Jones*, for the appellee.

BOWIE, J., delivered the opinion of the Court.

The appellee filed his bill in the Circuit Court of Baltimore City, on the 7th July, 1877, praying a divorce "*a mensa et thoro*" from the appellant.

It is alleged by the bill substantially that the parties were married about the tenth of February, 1876, and lived harmoniously together for about two months, when the appellant became quarrelsome and abusive without cause and intolerable in her conduct towards the appellee. It is specifically charged that the appellant, without reasonable provocation, upon one occasion, at least, locked the appellee "out of their residence and home for three days and nights; threatened him with violence, and finally, about the 27th of June, 1876, ordered him from their residence and home and forbade his return."

The bill further charged the appellant, generally, with cruelty, abandonment, and continued desertion.

The appellant, by her answer, denied all the charges of misconduct, general and specific. A general replication being filed, a commission was issued to take testimony, which was duly executed and returned.

The appellee produced and examined several witnesses in support of the allegations of his bill, and also filed a letter from the appellant to himself, and one from himself to the appellant. No testimony was produced by the appellant. The cause was submitted without exception to the evidence and without argument. On the 31st of October, 1877, a decree was passed divorcing the appellee from the appellant, "*a mensa et thoro*," from which this appeal is taken.

The decree below is assailed for the following reasons:

1st. That the evidence of abandonment and desertion consists exclusively of declarations of the wife, which, conceding for argument sake to be competent testimony, were insufficient grounds for divorce, because provoked by the fault and misconduct of the appellee.

2ndly. The appellee will not be allowed to take advantage of his own wrong.

3rdly. The declarations of a party to a suit for divorce are excluded as evidence by the policy of the law. The material facts disclosed by the evidence are few and simple and embraced in a very brief period of time.

Both parties had been previously married, each having adult children living, the issue of their former unions.

The appellant was in good circumstances, keeping house and living comfortably.

The appellee had been in business, but was compelled to compromise with his creditors, and wind up. During the courtship an estrangement occurred which led to a mediation through a mutual friend, and explanations from the appellee, in which he declared " he wanted to marry Mrs Coleman (the appellant) for love, and not for money, and if she can afford to live in this property, in this style, I can easily bring in enough for the food and clothing of myself and son and more than that ;" and in further conversation said, " he thought he would have enough to start in business, and be able to support the family ; that when he had settled his business he would be worth $4,000 or $5,000."

These statements were communicated in part to the appellant. The parties were married in February, 1876. A few months afterwards the appellant complained to the witness that she was awfully deceived in the appellee, that he had awfully deceived the witness ; " he had no clothing," " nor did he do the least thing for the family, as he promised he would."

" She stated to the witness that complainant had threatened her and shaken his fist in her face, and refused to

give her any money to provide for the family, and she would not stand it any longer." She said to the witness, Wysong, "she could not support him, (the appellee,) out of her income, as he had failed to do certain. things he had promised before marriage."

It was further proved that the appellant had borrowed money three or four times, from her trustee, assigning as her reason that her husband brought in no money at all.

No evidence is adduced to prove the quarrelsome disposition or abusive and intolerable conduct of the appellant towards the appellee. The fact of locking out appears to have been admitted, but the parties resided together afterwards, and it must be considered as condoned. To another witness, she said, "Mr. Childs did not bring in any money for the necessary support of the family; that his son had behaved improperly, and given her impudence, and Mr. Childs had threatened her in language she would not submit to, and she said he left and she would never allow him to come back."

No attempt has been made to impeach the truth of these declarations by the appellee, and being offered by him must be regarded as conclusive of the facts to which they refer. It is shown by other testimony, incidentally, that the appellant's property was vested in a trustee, and her income was not more than sufficient to maintain herself and her son comfortably; that she had been obliged to sell her carriage and horses, and borrow money.

From the representations and assurances of the appellee, as well as the legal obligation of marriage, it was his duty to provide his wife with bed and board, and support himself and son, in the absence of any contract to the contrary.

No greater wrong can be committed by a husband against a wife than failure in this most essential obligation.

Assuming the declarations of the wife to be true and admissible as part of the "*res gestæ,*" the case they estab-

lish is that the appellant, induced by the flattering promises of the appellee, married him, but in a few months found herself grossly deceived and imposed on, the appellee failing to contribute anything to the maintenance of the family ; that provoked by the ill-manners of his son, and insulted and threatened by the father, (who left the house,) she forbade him to return.

The appellee withdrew his effects from the appellant's house on the 27th June, 1876, and on the 7th of August, she informed him, by letter, he should never put his foot inside of her doors again.

The Ecclesiastical Courts have long since adopted and proceeded upon these principles. In the case of *Waring vs. Waring*, 1 *Eng. Eccles. Rep.*, 211, Sir WILLIAM SCOTT delivering his judgment upon an application for a divorce by a wife, on the ground of cruelty, after defining the term and declaring that upon the showing of cruelty the Court would release her from cohabitation, declared, "in doing this the law presumes her not to be the authoress of her sufferings ; it is on the presumption that her own conduct has been proper, if not, the remedy is in her own power, she has only to change her conduct, otherwise the wife would have nothing to do but to misconduct herself, provoke the ill-treatment and then complain."

In the case of *Best vs. Best*, 2 *Eng. Eccles. Rep.*, 158, 163, in a suit for divorce by a wife for cruelty, the Consistorial Court declared, "it has been repeatedly laid down in these Courts that no wife can solicit their interference with effect to protect her from ill-treatment which she has drawn upon her by her own misconduct, she must *first* at least seek a remedy in the reform of her own manners."

The reason of these decisions applies as strongly to petitions for divorce "*a mensa et thoro*" for abandonment as for cruelty. If the alleged abandonment is the necessary result of the conduct of the party seeking the divorce, he or she must first reform and change his or her conduct.

The Legislature, whilst committing jurisdiction in matters of divorce to the Circuit Courts of the State, did not alter the law which regulates the relation of husband and wife, nor diminish in any degree the sacred obligations of marriage.

In England this branch of matrimonial causes was subject to the jurisdiction of Ecclesiastical Courts, which were governed by the principles of the canon and civil law, which to that extent became a part of the common law, and as such is recognized and adopted by the declaration of rights and Constitution of this State as a part of the law of the land.

When the Code of Public General Laws enacts that married persons may be divorced for abandonment and desertion, or cruelty of treatment, those terms must be understood as interpreted by the Courts of special jurisdiction from which they were derived.

" The law has said that married persons shall not be legally separated upon the mere disinclination of one or both to cohabit together." * * * * "That the duty of cohabitation is released by the cruelty of one of the parties is admitted, but the question occurs, *what is cruelty ?* " Declining to define the term the learned Judge declares : " It is the duty of the Courts, and therefore the inclination of the Courts, to keep the rule extremely strict. The causes must be grave and weighty, and such as show an absolute impossibility that the duties of the married life cannot be discharged. In a state of personal danger no duties can be discharged, for the duty of self-preservation must take place before the duties of marriage, which are secondary both in commencement, and in obligation ; but what falls short of this is with great caution to be admitted." The rule of " *per quod consortium amittitur* " is but an inadequate test, for it still remains to be inquired what conduct ought to produce that effect ? Whether the *consortium* is reasonably lost ? and whether the party quit-

ting has not too hastily abandoned the *consortium.* The same learned Judge in the same opinion declares, "Marriage is the most solemn engagement which one human being can contract with another. It is a contract formed with a view not only to the benefit of the parties themselves, but to the benefit of third parties ; to the benefit of their common offspring, and to the moral order of civil society. To this contract is superadded the sanctity of a religious vow. * * * There are undoubtedly cases for which a separation is provided, but it must be lawfully decreed by public authority and for reasons which the public approves."

Mere turbulence of temper, petulance of manners, infirmity of body or mind, are not numbered amongst those causes ; when they occur, their effects are to be subdued by management, if possible, or submitted to with patience ; *for the engagement was to take for better, for worse,* and painful as the performance of this duty may be, painful as it certainly is in many instances, which exhibit a great deal of misery that clouds human life, it must be attempted to be sweetened by the consciousness of being a duty, and a duty of the very first class and importance. *Evans vs. Evans,* 2 *Hagg. Rep.,* 310.

Abandonment is not mentioned expressly as a ground of divorce in England. SHELFORD says malicious desertion is a ground of divorce in some countries, but not in England. * * * * The principal feature of malicious desertion is leaving the wife without any provision. *Shelford on Marriage and Divorce,* 419.

When the Statutes of the several States confer jurisdiction on the Civil Courts in matters of divorce, for causes that are cognizable in the Ecclesiastical Courts of England, it must be presumed they use these terms in their technical sense, and terms not technical in their popular sense, except so far as qualified by their context. There is not in this case evidence of desertion or abandonment on the

part of the appellant, in their proper legal sense. We think there was error in granting the divorce, and the decree below should be reversed with costs and bill dismissed.

> *Decree reversed, and*
> *bill dismissed.*

(Decided 23rd July, 1878.)