# FLORENCE A. SHUFELDT *vs.* ROBERT W. SHU-FELDT.

*Divorce—Evidence of Adultery—Exceptions to Testimony.*

Upon a bill for divorce on the ground of adultery it is not necessary that any one act should be proved as having occurred at any certain time and place, but the Court must consider the opportunity for the commission of the act, the conduct of the parties and all the circum stances, and then determine from the whole testimony whether it should convince unprejudiced and cautious persons of the guilt of the defendant.

When adultery is charged, evidence of the conduct and relations of the defendant with the co-respondent before defendant's marriage with the plaintiff is admissible when defendant's relations with the co-respondent after marriage are similar.

Upon a bill by a wife for divorce on the ground of adultery, the evidence was to the effect that before his marriage the defendant, who was a widower with young children, employed a young woman as attendant and housekeeper; that she occpuied a bedroom communicating with that of defendant, the door between the rooms being without a fastening; while the children and a servant occupied rooms in a disconnected part of the house; that she sat at table with defendant; that he had been seen to kiss her; that early one morning, when she was in the house, a servant observed that her bed had not been occupied; that defendant, who was a retired physician, gave the woman cold baths when she was ill, carrying her alone into the bath-room for that purpose, etc. Just before plaintiff's marriage with defendant, the woman left the house and obtained employment as a domestic elsewhere and never came to the house while plaintiff was there. During this time defendant frequently met the co-respondent upon street corners by appointment and often wrote to her in affectionate terms; he called to see her at the servants' entrance of the house where she was employed. There was also evidence, but not of a satisfactory character, showing that he had during this period gone with the co-respondent to a house of ill-repute. After having been married for about two months, the defendant compelled plaintiff to leave his home and return to her mother's, and his letters showed that she had become an oppressive burden to him. As soon as she left, the co-respondent returned to defendant's house and resumed her position as housekeeper, occupying the same bedroom as formerly, adjoining that of defendant. *Held*, that the defendant's adultery was established and that the plaintiff is entitled to a decree of divorce *a vinculo matrimonii.*

A general exception to the testimony of a witness in an equity cause is insufficient when some of it is competent.

Appeal from a decree of the Circuit Court for Montgomery County (LYNCH and HENDERSON, JJ.), dismissing the bill of complaint.

The cause was argued before McSHERRY, C. J., BRYAN, FOWLER, BRISCOE, PAGE and BOYD, JJ.

*John Sidney Webb* and *Harris Lindsley* (with whom was *Henry R. Webb* on the brief), for the appellant.

*Hattersley W. Talbott* and *Charles W. Prettyman* (with whom was *O. H. W. Talbott* on the brief), for the appellee.

BOYD, J., delivered the opinion of the Court.

The original bill, which was filed in this case June 9th, 1896, relied on cruelty and abandonment as the grounds for the divorce sought at that time, and prayed for an allowance of alimony. The Court had passed an order requiring the appellee to pay alimony *pendente lite* and counsel fees, and had set the cause for hearing when the appellant filed an amended bill, in which she charged the defendant with adultery. It is alleged that on the 11th and 13th days of September, 1895, he committed adultery with a certain woman named in the bill, whom we will speak of as the co-respondent, although not technically such, in a house on 13th street, in the city of Washington, and that since the autumn of the year 1895 subsequently to the desertion of the complainant, the defendant has lived with this woman in his house in Montgomery County, Maryland, and in said house had on repeated occasions, the exact dates being unknown to the complainant, committed adultery with her. An answer was filed by the defendant denying the charges, and testimony was taken. The bill having been dismissed, this appeal was taken.

Under our view of the case, it will be unnecessary to refer to the charges of desertion and cruelty, excepting so far as they may reflect upon the other question. The complainant and defendant were married September 4th, 1895,

in the State of New York, and went at once to the home of the defendant at Takoma, Montgomery County, in this State—arriving there the day after the marriage. She remained there until October 26th, when she went to her mother's, returning on November 5th to the house of the defendant, where she remained until the 7th instant, when she left, and has not been there since. There is some conflict between them as to the cause of her going away, but it seems apparent that she went to her mother's, at the instance of the defendant, and finally left his house because she could not live there as a wife is entitled to live in her husband's home Be that as it may, however, at the end of about two months from the day of their marriage they separated, and for ten days of that time she was absent. In October, 1891, while the defendant's first wife was in an insane asylum, the co-respondent, who was then nineteen years of age, went to live with the defendant as his housekeeper and a companion for his children, at the wages of twelve dollars per month. In April, 1892, the first wife died, leaving four children, one son about fourteen years of age, and another about twelve, a daughter about nine and another daughter not quite two years of age. When this young girl first went to the house of the defendant, she occupied a room in the third story, keeping the youngest child in her room, and the other daughter occupied a room on the same floor. The defendant's bedroom was then on the second floor adjoining his study. In the latter part of 1892, the house was altered by the addition of a tower, a kitchen and servant's room over it. The co-respondent then moved down stairs into the room formerly occupied by the defendant as his bedroom, and he went into the front room which he had used as his study. There is a door between these two rooms. The two girls were put in a room in rear of the co-respondent's room, but there was no door between them. The servant's room is still beyond that, being separated from it by a small hall. The plaintiff swore that the door between the rooms occupied by the defendant and the

co-respondent would neither latch nor lock while she was there, and that the defendant told her it had not closed since he had put a furnace in the house, as the jambs were shrunken. He denied that, and said "the door was fixed in its jambs by the settling of the house, and when the two rooms came to be used again, I forced the door open, and took it off its hinges, and planed it myself so it would shut; I lowered the keeper so the lock would go into it, and at present, and ever since Miss L——— occupied that room, the door has been in perfect order and locks on either side." However that may be, the fact remains that a year or so after this young girl went there, she was brought down stairs and occupied the room adjoining the defendant, with a door between them, whilst his two little girls were put in a room which did not communicate with either their father's or that of their " companion," as she says she was and is. The children were so small that it was deemed necessary to lock them in their room at night, but it was not thought necessary to have them with their companion, or where she could communicate with them at night, excepting by going out into the hall, and then to their door. The eldest son of the defendant died, the exact date of which is not given in the record, and the second son was sent away to school in 1893, when he was about thirteen years of age, and remained away until July, 1895. A letter from that son to his grandfather shows that the defendant was keeping him away from home on the pretence that the woman in charge of his sisters said she would not stay if he returned. She denied on the stand that she had ever made any objection to his returning, but in point of fact, for some reason, he was kept away until the July before the marriage of the plaintiff and defendant.

These parties were so situated that it would be very difficult to establish by direct evidence many acts of intimacy or misconduct, as there was little opportunity for any one to witness them if they occurred. A servant who lived there in 1893, swore that she saw the defendant kiss this girl in

the hall, and also that between five and six o'clock one Sunday morning, a fire broke out in the neighborhood, and they were aroused, and all went out to see it. Afterwards she returned, went up stairs and thus describes what she saw : " I noticed that Dr. Shufeldt's bedroom was open, and the housekeeper's door was open, and I noticed that her bedroom had not been used that night, because she done during the day some sewing and she put it there in the evening, and I saw it in the same place where she put it before." She said the sewing was on the bed Saturday evening, and Sunday morning it was at the same place where it had been put Saturday. Another servant, who lived there in June and July, 1894, swore she saw him kiss her one morning after coming from town. She also swore that she saw the defendant in the housekeeper's room late at night in his night-clothes. The defendant denied that he was in there in his night-clothes, but says he had on a dressing gown, that she was very sick with typhoid fever, and some complications which lasted for several months. He is corroborated by Dr. Beeble as to the sickness, who testified that he had attended her in June and July, 1894, but the defendant, who was formerly a surgeon in the army, admits he had not practiced regularly since 1889, when he was retired from the army, and had never, during that time, attended any other case of typhoid fever. Of course there would be no impropriety in a physician being in the bedroom of a patient, or applying remedies for her relief, but the proof in this case shows that the defendant, over and over again, gave this girl cold baths, carrying her into the bathroom for that purpose, and frequently applied cups to her abdomen, when no one else was present. If her condition required such treatment as the testimony shows it probably did, it would seem to have been at least more delicate if he had either had a nurse, or had called in the other servant when it was necessary to give her baths. It shows an intimacy that, to say the least, was very indelicate under all the circumstances. The application of cups may have been

required unexpectedly, and when no one·was present that
he could have called on, but there certainly could have been
no necessity for him, a man then about forty-four years of
age, not in regular practice, to administer the baths, espec-
ially as the evidence shows that the servant woman did fre-
quently wait on her.

What we have spoken of occurred prior to the marriage
of the plaintiff, and is only relied on to show the relation
between them at that time.    Mrs. Shufeldt arrived at
Takoma Park on September 5th, 1895, and just before her
arrival the co-respondent left the defendant's house. On the
evening of the 9th of that month the defendant met this
girl at the corner of Lafayette Square by appointment—she
having, as she says, some presents for the children. On the
12th instant, he wrote her a letter, although he was suffer-
ing greatly at the time from a fall.    In it were such expres-
sions as " be a *very good girl* and try hard to find a nice
home ; " "as soon as I get to town again, I'll try and help
you secure a good home.    You are a very, *very* deserving
girl, and ought to have the best of one.    If your pocket-
book gets a little low, write the doctor, and I'll come in and
help you and try to cheer you up," " believe me, Alphild,
every your old friend, the doctor, etc." The next day, accord-
ing to his and her testimony, he went to the residence of Mr.
Scharf, in Washington City, where she was then employed
as a domestic, went to the side door, and inquired for her—
after asking permission of Mr. Scharf. He gave her a letter he
had for her, and asked her if she could not walk up the street
with him.   She got permission from Mr. Scharf, whose wife
was out, put on her hat and joined him at the corner of 14th
and Princeton streets, and they walked about five blocks to
the junction of the car line he was to take home, where he
says he left her.    She says she met him again on the 20th
of September, and admitted that she received six or seven
letters from him, and saw him " about three times " during
the month she was at Mr. Scharf's—that she always met
him opposite the club, of which he is a member.    He ad-

mitted he had seen her between seven and ten times, while his wife was living with him.    Thus we find this retired officer of the army at the servant's entrance of a gentleman's house, and on a public square meeting, generally in the evening, a girl who was then occupying the position of a domestic, and had gone to his house as such, although she became his housekeeper and a companion for his children. Not once during those two months did that girl go to her former home, where the little children she professed such devotion to were living.  What possible excuse can a gentleman have for such frequent interviews with another woman at such places, and under such circumstances, when he had a home within easy reach, where all matters of business could have been attended to ?    Is such conduct consistent with innocent relations between them, when we recall how they had lived for the two or three years prior to that time ? But although as late as September 19th, 1895, he wrote to his wife's mother that " Florence is a treasure of all treasures, and has done everything a woman could possibly do since her arrival, and I am quite sure we all appreciate her very generous efforts, her noble qualities, and above all, her ready adaptation to her place as a true and loving mother. The children are as happy as happy can be with her," we find that soon their troubles began—just such troubles as must sooner or later come when a husband is unfaithful to his marriage vows,for there can be no surer means adopted to estrange husband and wife, and stifle all affections that ever existed between them, than the existence of improper relations, especially of a criminal nature, between one of them and another party.    It is true they differed as to some of the occurrences, and widely differed as to which of the two was the real cause of their separation, but there are some facts which conclusively show that this woman, whom he had married in September, was already in October, a burden to him— that he wanted to get rid of her we cannot doubt, after reading the testimony.    She left his house for her mother's on October 26th, 1895, at his instance, and on October 28th

he wrote her a letter, which is absolutely convincing as to his feelings and conduct towards her. Amongst other things, he said, " my health and mind are both *slowly* improving since your departure and I feel the relief from the depression, the *terrible* depression which comes over me whenever and wherever I am in your company. I *cannot* control it, and I am *absolutely* certain that I *never* can." And again, " so, Florence, *whatever* we do to rectify this fearful mistake, let it (*for the sake of my tender little girls*), be done quietly and swiftly. The solution, the *only solution* possible, of the unhappy affair, has already been sufficiently discussed by *us* to obviate the necessity of writing about it." That letter and the testimony of Mr. Tyler, a lawyer and a cousin of the plaintiff, who went to Washington at her instance, after her return in November, as well as the evidence of the plaintiff herself, conclusively establish the fact that he forced the separation. She left his house, went to a friend in Washington, and within ten days, while Mrs. Shufeldt was still in Washington, this girl, who for those two months had occupied the position of housemaid, etc., to others, is again the " housekeeper," practically the " lady of the house " for the defendant in place of his lawful wife. She again occupies the bedroom which communicates with that of the defendant, and from the middle of November, 1895, to the time she testified in March, 1897, had full sway in that house which she never entered while the wife of the defendant was in it. What could have kept her from that home and the children, especially the one she says she tried to be a mother to, for those two months, but a consciousness of her own guilty relation with the husband of the woman that then presided over it? She had never seen the plaintiff— she had no reason to suppose she would not receive her kindly—in fact, she had suggested to her husband that this girl be given a home with them until she got a satisfactory one for herself. Possible it is, of course, that these people could live together and no improper relations exist, but in all human probability it could not be under such circum-

cumstances as are disclosed by the record.   The presumption is against it.   Although it was nothing to her discredit that she occupied the humble position of a domestic, it is a strong circumstance to be taken into the consideration of this case when it is remembered that the defendant's social position was so different.   He is apparently a well-educated man, of literary attainments, and a retired officer of the army, and it would put the credulity of the most credulous to a severe test to ask them to believe that he would have placed himself in the compromising position that he occupied at Mr. Scharf's, and at other places of meeting with her, if there had not been moving him motives other than a mere desire to obtain for her a comfortable home, to deliver letters to her, or such other flimsy excuses as he has given.

The testimony of Mrs. Gladstone is sufficient to establish the charge in the bill if it be accepted as true.   She swore that she saw the defendant and this girl go into a house of ill-repute in Washington on September 11th, 20th and 22nd. A good deal of testimony was taken to show that the co-respondent was not at Mrs. Scharf's on the 11th, and that she did not go there until the 13th.   But that is a very immaterial error, as the evidence shows conclusively, and the defendant himself admits it, that he did not call at Mrs. Scharf's on the 13th, and that this girl did join him and go up 14th street with him.   We have already given his explanation of that.   This witness swore that they got on a 14th street car, went to 15th street where they got off, and then went to the house on 13th street, which she said they entered—that she suspected her, and went unobserved on the same car they took to 15th street.   It is true that the defendant has endeavored to show by Mrs. Scharf that this could not be, as the co-respondent was there when she returned from a drive, but it does not necessarily follow from that that she is mistaken, as Mrs. Scharf testified she was out driving between four and six o'clock on that evening, and Mrs. Gladstone and the girl both swore it was about

seven o'clock in the evening when defendant called. Mrs. Gladstone also swore that she saw them meet on the 20th instant, at a hotel, the Raleigh, she believed it was called— that they went out, she followed them, and they again went into the same house on 13th street. They admit that they met the evening of the 20th, but both indignantly deny that they went to the house on 13th street then or at any other time. Some testimony was offered to impeach the character of this witness, but it falls far short of the requirements of the law, and as offered, was totally inadmissible. It amounted to nothing more than the individual opinions of four or five persons of the veracity of Mrs. Gladstone. It is difficult to believe that a witness without some motive being shown, would deliberately perjure herself and make such statements without some foundation for them. As to two of the occasions, she is corroborated to the extent that they were together, but her evidence does seem improbable in some respects, and is contradicted in some particulars. We would, therefore, hesitate to base our decision on it alone. But if we leave it out of consideration altogether, we are still driven to the conclusion that the relations existing between these two parties were not innocent.

It not necessary in cases of this character that there be any one act proven which is conclusive of guilt, but the Court mnst consider the opportunity for the commission of the act, the conduct of the parties and all circumstances, and then determine from the whole testimony whether it should convince unprejudiced and cautious persons of the guilt of the parties. If it be true that prior to the marriage they were seen to kiss each other, as described by two witnesses, and that only one of the two beds in the communicating rooms used by them was occupied the night before the fire, those facts, together with others we have referred to, are evidence of such convincing character, that there can be no escape from the conclusion that there was illicit intercourse between them at that time. If that be accepted as proven, which we must do, nothwithstanding the denial

of the defendant and the co-respondent, then their conduct during Mrs. Shufeldt's stay at Takoma, and this girl's return to the defendant's house, her occupancy of the bedroom adjoining his, and their conduct so far as open to the public, must suggest what transpires in their privacy, and be conclusive of proof of a renewal of their guilty relations. It is admissible to prove the previous conduct of the parties, as reflecting upon the legal inferences that may be drawn as to what their conduct is at the time complained of when opportunity is again offered.    It is not necessary to prove the direct fact of adultery, as it is rare that parties are caught in the act.  "In every case almost the fact is inferred from circumstances that lead to it by fair inference, as a necessary conclusion ; and unless this were the case, and unless this were so held, no protection whatever could be given to marital rights." *Loveden* v. *Loveden*, 4 Eng. Ecc. 461.  It may be that some of the acts of the parties would alone only amount to imprudence, but as Sir William Scott once said on that subject, "there may be, I must observe, imprudence of different kinds and degrees, and there are degrees of imprudence, from which a Court of Justice will infer guilt." *Chambers* v. *Chambers*, 4 Eng. Ecc. 448.  In the same volume, in the case of *Burgess* v. *Burgess*, he said on page 529 : "In considering the legal effect of this evidence, I must proceed on the established doctrine of this Court, as it has been laid down in various cases, that it is not necessary to prove the fact of adultery at any certain time or place, *modo et forma, loco et tempore.*  It will be sufficient if the Court can infer that conclusion, as it has often done between persons living in the same house, though not seen in the same bed, or in any equivocal situation."  In *Chambers* v. *Chambers, supra,* it was said: "Courts of Justice must not be duped.  They will judge of facts, as other men of discernment, exercising a sound and sober judgment on circumstances that are duly proved before them.  That a young woman estranged from her husband, and a young officer should be living together for months, and at different

places, though under the flimsy disguise of separate beds,
and that Courts of Justice should not put upon such inti-
macy the construction which everybody else would put
upon it, would be monstrous." Apply those well-recog-
nized principles to this case, and what other result than the
one we have already intimated, can be reached? Bear in mind
the different social positions the defendant and co-respon-
dent occupied, how ready, rather how eager, he was to obey
her summons which called him from the society of his bride.
Picture him as he suffers great bodily pain while he writes
to her just one week after his wife arrives, or as he sent
the woman he had promised to love, just two weeks before,
to her country home in charge of his son, while he remains
in the city to meet the then chambermaid on a public square
of the city about seven o'clock in the evening of September
20th, that being the hour testified to by her. Or see him
knocking at the servant's door of a gentleman's house to see
her, or as he waits at the street corner, and escorts her five
squares, according to her statement. Then remember how
soon he became estranged from his lawful wife, how often
he avoided her society even at meals, how frequently he
saw and wrote to the co-respondent, read his letter of
October 28th, 1895, to his wife, see her as she goes from
the home it was his duty to provide her with to make way
for this servant girl, who now again occupies the place she
had vacated a few weeks before. Then recall the relations
that existed before the marriage, and that whatever they
were, they can reasonably be presumed to still continue, as
the same conditions for the most part do exist, and what
conclusion must all these facts, and the others in the record,
lead us to? Is this plaintiff still required to remain the wife
of the defendant, because no one has proven the " direct
fact of adultery," or is she to have the benefit of the pre-
sumption that arises from proof of such circumstances as
are in this case? Judging from the record itself, without
any knowledge of the parties, except what we find there,
we are forced to the conclusion that the case of the plaintiff

has been established, and she is entitled to a divorce *a vinculo matrimonii.* We cannot better conclude this opinion than by adopting the language (with only such changes as are necessary to correctly apply to the parties here), of the Supreme Court of Illinois, in *Dunham* v. *Dunham*, 162 Ill. 589, that the "appellee and the co-respondent may be innocent of this serious charge, as contended by his able and faithful counsel, but Courts must decide questions of fact from the evidence, and parties are only themselves to blame, when by their own conduct, they furnish the evidence of their own condemnation."

It is not necessary to discuss the exceptions to the testimony. We may say, however, that those of the defendant cannot be sustained, because they are too general. Some of the testimony of every witness excepted to was relevant and material, and therefore, cannot be excluded by such general exceptions, unless it be the testimony of Mr. Munroe, which we have not taken into consideration, as we think it wholly immaterial what the entry in Mrs. Scharf's book was. What we have said as to the witnesses, applies to the documentary evidence, as some of the letters are relevant, and material, and hence all cannot be excluded.

The decree will be reversed, and the cause remanded, so that a decree granting a divorce *a vinculo matrimonii* to the camplainant may be passed, and that the lower Court may take such action as to alimony as the circumstances may justify.

> *Decree reversed and cause remanded, costs to be paid by the appellee.*

(Decided January 4th, 1898).