HERMAN GEORGE WENDEL *v.* ELIZABETH H. WENDEL.

[Nos. 33, 34, October Term, 1927.]

12

*Decided December 8th, 1927.*

The causes were argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Raymond S. Williams,* with whom were *Hershey, Donaldson & Williams* on the brief, for Herman George Wendel.

*Allan H. Fisher and Morton P. Fisher,* for Elizabeth H. Wendel.

Offutt, J., delivered the opinion of the Court.

These are cross appeals by Herman George Wendel, herein referred to as the appellant, and Elizabeth H. Wendel, his wife, referred to herein as the appellee, from a decree of the Circuit Court of Baltimore City. The decree allowed Mrs. Wendel $20 a week alimony, and $750 counsel fee (subject to increase in the event of further proceedings), and dismissed the cross bill of Mr. Wendel, in which he prayed for an absolute divorce on the ground of abandonment.

The original bill was filed by Mrs. Wendel on November 2nd, 1923, and in it she alleged that she had discovered from the conduct of her husband that for a long time prior to that date that he was losing all love and affection for her, and that "said conduct and treatment having grown continually worse and having become so neglectful and intolerant that she began to make an investigation of the causes therefor, and that she discovered that said neglect, ill-treatment and abuse were due to the defendant's infatuation for other women, and particularly to his infatuation for a certain woman whose name is known to your oratrix." She further charged that for "the last several months" appellant's conduct towards her had become "harsh, vicious and cruel," that he had failed to provide her with reasonable "necessaries" or the means of procuring them; that he had threatened her with bodily harm, and was in the habit of abusing her by the "use of vulgar and profane language"; that because she had nowhere else to go she had been obliged to live at appellant's domicile, 3003 W. North Avenue, in Baltimore City, until November 1st, 1923, when appellant endeavored to have the furniture removed from that house, but was prevented from doing so by the appellee, and that thereupon he left "said premises" and that she did not know "whether or not he intends to return." She further alleged upon information that appellant had a net annual income of $10,000, and a substantial estate. Finally, she charged that he had threatened to dispose of his property, in order to deprive her and her child of any interest therein, and that, unless her rights and property were protected by a restraining order pending the

suit, she would suffer irreparable loss. In her prayers for relief she asked, (1) that she be allowed permanent alimony, (2) alimony *pendente lite*, (3) that appellant be enjoined from disturbing her in the possession and occupation of 3003 W. North Avenue, (4) that he be enjoined from disposing of his property or business pending the suit, and (5) for general relief.

Upon that bill a restraining order issued as prayed, and the court passed an order. *nisi* allowing her seventy-five dollars a week as alimony *pendente lite.* The appellant in due course filed an answer denying the misconduct charged against him, stating that he had provided a home for his wife and child at 1522 Park Avenue, where he had intended moving the furniture from 3003 W. North Avenue, but that his wife refused to move to that home, protesting that he had been a kind and affectionate husband, and that he had provided liberally for the support of his wife and daughter, alleging that his gross income was less than $5,000, and his gross expenses over $4,000, setting out in some detail the items of his estate, and charging that his wife was extravagant, that she had an "ungoverned" temper, and that for "years past" she had "nagged and harassed" him to the verge of nervous prostration. On November 8th, 1923, the injunction was dissolved, and on November 17th, 1923, alimony *pendente lite* was allowed at forty dollars a week upon the condition that appellee remove from 3003 W. North Avenue.

Nothing further was done in the case until May 12th, 1925, when James E. Tippett, Esq., a member of the bar, filed a petition for counsel fees for services rendered Mrs. Wendel in the preparation of the pleadings, and in conducting the proceedings connected therewith, in her suit against the appellant. In substance the petitioner charged that Wendel had property worth $30,000, and an annual income of $5,000, and that the appellee was without means. Wendel in his answer traversed those allegations, and then added this: "Further answering said petition as a whole this defendant says that even if the plaintiff in this cause has not sufficient means to pay a counsel fee to her solicitor, nevertheless no

counsel fee should, under the practice of this court, be allowed at the present time for the reason that the bill of complaint filed herein on the 2nd day of November, 1923, has never been heard on its merits, that the cause is therefore not concluded and that under the practice prevailing in the equity courts of Baltimore City, counsel for a wife in a divorce or alimony proceeding is never allowed a fee to be charged against a husband until the final conclusion of the proceedings, particularly in cases where the proceedings are originally instituted (as in this case) by the wife."

The case again slept until December 17th, 1925, when the appellant filed a cross bill praying for an absolute divorce from his wife on the ground of abandonment. Mrs. Wendel answered the bill, denied the desertion, but charged that Wendel had been guilty of adultery, and that he had abandoned her. The parties again rested until March 19th, 1927, when Wendel demurred to so much of the answer as charged adultery, because the appellee had neither named the person with whom it was committed, nor stated that the name of such person was unknown to her. Following that there was filed by Mrs. Wendel another petition for counsel fees for defending herself against the cross bill. Appellant in his answer to that petition asserted that Mrs. Wendel had funds of her own sufficient to pay her counsel, and that therefore he should not be required to pay such fees.

On the 10th of May, 1927, over three and a half years after it was instituted, the case finally came on for a hearing and testimony in open court, and after the hearing the court, on May 31st, 1927, entered the decree referred to above.

The appeals from that decree require us to determine, (1) whether the evidence in the case was sufficient to support the conclusion that the appellant's conduct towards his wife was such as to justify an allowance of permanent alimony to her, (2) whether it was sufficient to show that the wife abandoned and deserted the appellant for a continuous period of more than three years next preceding December 17th, 1926, and whether such abandonment was

final and deliberate and the separation of the parties beyond any reasonable expectation of reconciliation, and (3) whether the allowance for counsel fees and alimony was reasonable and proper under the circumstances of the case. These questions we will consider in their order.

The record in this, as in many other similar cases, abounds with frivolous and trivial details, accusations, recriminations and ill will.

There are some facts which are not disputed, and, as they throw some light on the conduct of the parties and are of some assistance in valuing the other evidence, they may be given in narrative form and are as follows: Wendel, who is now forty-eight years old, began to work for a living when he was sixteen. He started as a helper in a drug store at $8.33 a month. Eight years later he had graduated in pharmacy, and was working in a drug store at $16 a week and had received $4,500 from his father's estate, and at or about that time he married his present wife. He appears to have been industrious, frugal and shrewd, and in the course of time he prospered in a moderate way, accumulated some property, his earnings increased, his standard of living was raised, and it became possible for him to live without the severe economy of his early years. For some years the marriage appears to have been a fairly successful venture. There were some quarrels, she said he was cold, stubborn and stingy, he said she was nagging, extravagant and headstrong. But the evidence indicates that they both did their part in maintaining the common home; he was a hard worker, and at times she helped him in his business, they made friends, and occasionally entertained them. He provided for the home with as much liberality as appears to have been consistent with his property and income, and supplied his wife with reasonable funds for clothing. As the years increased, however, their differences became sharper and more serious, until November 1st, 1923, when he left his home and failed to return, and on the following day she filed the original bill in this case.

The case in respect to both the cross bill and the original bill turns at last largely upon the testimony of Mr. and Mrs. Wendel. As we have intimated, much of the testimony relates to trifling and immaterial things, which are without any importance or significance in such cases as this. If every petulant or impatient expression, every thoughtless or inconsiderate act, every little failure of courtesy or forbearance occurring in the home is to be cherished and recorded, to be dragged out and exhibited in anticipated divorce proceedings, the average home, instead of being the theatre of the usual humdrum give and take of married life, would rather resemble an armed camp, with each adversary watching for some slip or error on the part of the other, and in our opinion little weight should be attached to such testimony. The substantial facts alleged by Mrs. Wendel as a ground for relief, are (1) cruelty, (2) abandonment, (3) non-support, (4) adultery, while Mr. Wendel relies upon abandonment and desertion, as grounds for the relief sought in his cross-bill.

As reflecting upon her charge of cruelty, Mrs. Wendel said that for years her husband had been stubborn and stingy, morose and gloomy, that for long periods of time he would not speak to her, that he continually cursed and abused her, that he was cold and indifferent, that on one occasion he struck her with a belt buckle, and that on another, when he was attempting to remove the furniture from 3003 W. North Avenue, he threw her against a radiator, and he struck her friend, Mrs. Purinton, "an unmerciful blow" with a chair, and that on still another occasion he "pinched" her. These charges of physical violence are unsupported by the record. In explanation of the "belt buckle" incident, Wendel said that he, his wife, his daughter, and Marian Huntley would play cards in the evening, and that frequently, at the conclusion of the game, there would be a romp, they would throw pillows at each other, and that he may on such an occasion have struck her with a belt, but that if he had it was done in play. In that explanation he was partly corroborated by Miss Huntley,

18

while Mrs. Wendel's statement was wholly unsupported. The supposed assault upon her and Mrs. Purinton also loses much of the vicious character given it by Mrs. Wendel in the light of other testimony. Miss Huntley, a witness called by Mrs. Wendel, said that Wendel was attempting to move "something out," when Mrs. Wendel tried to stop him, and he shoved her away, and she said she thought that on the same occasion Mrs. Wendel grabbed her husband and scratched his face. The incident occurred under the following circumstances: Wendel had notified his wife that he intended to move from the North Avenue house to an apartment on Park Avenue. His wife opposed the change, but he attempted to go on with it notwithstanding her opposition, and, on November 1st, 1923, sent moving vans to carry the furniture from the old home to the new. The men with the vans had already placed some of the furniture in the vans when they were stopped by Mrs. Wendel. There was some confusion and excitement, Mr. and Mrs. Wendel were both very angry, the moving people did not know whom to obey, Marie the daughter, hoping to create a diversion, pretended to swoon. Upon that scene Mrs. Purinton, who with her husband rented the second floor of the house, entered. She had no connection of any kind with either Mr. or Mrs. Wendel, but she volunteered to protect Mrs. Wendel from her husband. And, to quote her testimony, she attempted to discharge that duty in this way: "Mrs. Wendel was very nervous, which anybody would be, and I was myself. I was so nervous I did not know what I was doing hardly, and several of the pieces of furniture, Mrs. Wendel said to me, belonged to her, and I said to her, 'I would not let him take it.' And she said, 'What will I do?' I said, 'I just would not let him take it if it was mine, if I paid for it.' Q. Where was Mr. Wendel? A. He was there about this time. Q. What happened then? A. He said to me, 'What right have you to interfere, Mrs. Purinton?' And I said, 'Only that you are abusing this woman so, and some one has to stand up for this woman.' That is what I said. Q. What did he say then? A. He

threw a chair back; he had a rocking chair in his arm and it struck me on the limb and I still have the mark, a very sore limb from it. I don't know whether he did it purposely. He just threw it like this (indicating); it had rockers and one of the rockers struck me." It also appeared that Mr. Purinton was in his apartment recovering from an attack of grippe, but that, although he felt able to protect his wife, she made no outcry, and that, although she later showed him the bruise made by the chair, neither of them complained of it to Wendel, or attempted to have him punished for striking her. That is the only material evidence relating to physical violence, and in our opinion it fails to support appellee's charges. Mrs. Wendel failed to give any of the circumstances of the occasion when she said Mr. Wendel struck her with a belt. If there had been anything to support the inference that it was wanton and deliberate, it may be assumed that she would have told it. But such evidence as there is rather indicates that it was done in play, with no deliberate intention of injuring her.

In regard to the occurrences on November 1st, 1923, it may be said that, while it was a painful and unpleasant scene of domestic discord and violence, there is nothing, aside from the testimony of Mrs. Wendel, to indicate that her husband intentionally touched or injured either her or Mrs. Purinton. He was in his own home, moving what we may assume from the evidence was his own furniture, and what he did appears to have been done in resisting physical interference by his wife and Mrs. Purinton with him in his effort to carry out that purpose.

Nor can we say that the evidence is sufficient to support the conclusion that Wendel abused and cursed his wife by the use of vulgar and profane language. That they quarreled early and often is unfortunately true, but whether he or she was responsible for these quarrels does not appear from anything in the record. Each accuses the other and neither was corroborated. Mrs. Wendel said that he cursed her, but she could recall no specific language, except that she knew he had never called her any vile name, and, while

Mrs. Purinton remembered hearing a quarrel on one occasion, when both Mr. and Mrs. Wendel were speaking in loud tones, and when Mr. Wendel said "terrible things" to his wife, she could not remember what they were. Marion Huntley, who lived with them, said they had little quarrels over money, but that she did not know who started the quarrels, that both would get angry, and that so far as she knew he acted like a "gentleman." Catherine Clabaugh, a neighbor, said that Wendel was a "nice," easy-going man, who always had a smile when you went in his store, and, so far as she knew, he and his wife seemed to be happy. Nellie G. Wilson, another neighbor, thought they were happy and congenial. Mrs. Robinson, a sister of Mrs. Wendel, said that in 1921, 1922 and 1923 Wendel was an ideal husband and very good, and that, while they had little "spats," they amounted to little until he started "running around with that woman." But other than Mrs. Wendel no witness heard him curse her, and except Mrs. Purinton, no witness corroborated Mrs. Wendel's testimony that he abused her, and even she was unable to recall a single word that he said. And Wendel himself denied that he had ever cursed or abused his wife, although he admitted that he might have used the word "damnable."

Giving this evidence its proper weight, in our opinion, it does not meet the burden assumed by the appellee of showing that appellant was guilty of legal cruelty. In this state permanent alimony will not be allowed except for causes sufficient to support a decree for a divorce *a mensa et thoro* or *a vinculo*. *Outlaw v. Outlaw,* 118 Md. 503; *Walker v. Walker,* 125 Md. 660; *Polley v. Polley,* 128 Md. 62; *Heinmuller v. Heinmuller,* 133 Md. 494. A divorce *a mensa et thoro* will not be granted on the ground of cruelty of treatment, unless the facts alleged to support it are clearly shown by at least a preponderance of the evidence, and are of such a character as to justify a reasonable apprehension that a continuance of the marital relation will injure the health of either party thereto, or destroy his or her reasonable expectation of a normal and happy life, notwithstand-

ing the willingness of the injured party to discharge fully
and faithfully all the duties and obligations of the relation.
Cruelty in that sense, and as used in the statute (Code,
art. 16, sec. 39), is legal cruelty, and is a technical word.
*Childs v. Childs,* 49 Md. 514. And in defining it, Judge
Parke for this court, in *Short v. Short,* 151 Md. 446,
said: "Legal cruelty must be such conduct on the part of the
husband as will endanger the life, person or health of the
wife, or will cause reasonable apprehension of bodily suf-
fering. It should be of such a nature as to render cohabita-
tion physically unsafe to a degree justifying a refusal to
continue it. Marital neglect, indifference, a failure to pro-
vide as freely as the wife may desire in dress or in con-
veniences, sallies of passion, harshness, rudeness, and the
use of profane and abusive language towards her, are not
sufficient, if not in manner and degree endangering her
personal security or health. *Childs v. Childs,* 49 Md. 514;
*Hawkins v. Hawkins,* 65 Md. 108; *Bounds v. Bounds,* 135
Md. 220." See also *McKane v. McKane,* 152 Md. 515.

Another contention of the appellee may be considered
either in connection with her charge of cruelty or her charge
of adultery. It is that appellant had been guilty of such
conduct with other women as would (1) have justified her
in refusing to live with him, or (2) have supported the in-
ference that he had committed adultery. It grew out of the
alleged relations between Wendel and a Mrs. Eicholtz, an
employee of a drug company with which he is connected.
Mrs. Eicholtz has been twice married. Divorce separated
her from her first husband and death from her second. She
has a married daughter about twenty years old, who for-
merly lived with her in Baltimore, but now lives in Lynch-
burg, Virginia. Wendel met Mrs. Eicholtz when she was
employed at the Chocolates Products Company, with which
he dealt, in 1919 or 1920. She lost that position, and he
secured employment for her with the Calvert Drug Company,
with which he was connected and with which he had dealt
for many years, where she remained until 1927. Wendel in
the course of his business dealings with that firm met her

almost daily, and their acquaintance rapidly ripened into something akin to friendship. Wendel thought it was a little less; she thought it was "just friendship." It sometimes happened that he would finish his business with the Calvert Drug Company as she left for the day, and he would drive her home in his car. She lived in an apartment, and from time to time would visit her there. Sometimes others were present; sometimes they were alone. On these latter occasions, he would play with the radio, or they would divert themselves by playing a game which he called "rummy." He took her to the movies occasionally, and not infrequently they went on long drives, sometimes alone and sometimes accompanied by others. Her parents lived at Gettysburg, and he would drive her up to see them. He went with her on automobile trips to Conowingo and to Lancaster, and they occasionally met at the home of some mutual friend.

The relations between Mr. and Mrs. Wendel had been strained for a long time before she instituted this proceeding. Marital relations between them had ceased in January, 1923. He had not spoken to her, she said, for nearly a year, and had not taken her for a ride in an automobile for an even longer period. He staid out late at nights, and on some nights he did not come home at all. Mrs. Wendel, some time prior to July or August, 1923, conceived the suspicion that his attitude towards her was caused by an infatuation for some other woman, and as a result of an examination of his garments she made certain discoveries which strengthened and sharpened that suspicion. She found contraceptive devices in her husband's pockets, she found stains on his trousers, and she found, she said, whiskey bottles and hairpins in his automobile. He denied that he had whiskey bottles in the car, said that the devices found in his pockets had been given him by a salesman, thought that possibly the hairpins may have belonged to his wife, and that the stains on his trousers were caused by spilling a syrup on them while at work in the drug store.

These explanations were not given to his wife, and appar-

ently they did not occur to her, because from that time on her suspicions became sharper, until one Saturday night in July or August, 1923, when she saw him come out of his garage in his "limousine, dressed up to kill," with a cigar in his mouth. Impressed by his appearance, she said to her daughter, "He is not going to work." She hired a taxicab and waited in front of his store from 12 until 1.30 o'clock. When he came out he went west on North Avenue followed by a Pennsylvania car, in which one man, a Mr. Funkhauser, and two women, were riding. She followed in the taxicab, and, when they reached Poplar Grove Street, one of the women in the Pennsylvania car got into Wendel's automobile, and they started off again, but stopped at Edmondson Avenue, and appellee then went to his car and saw a woman in it. She cried out, "Hello, George; I have got you at last." He did not stop to answer, drove off, and, when he caught up with Funkhauser, he transferred the woman to his, Funkhauser's, car. He did not return to his home that night, but went to the house in which Mrs. Eicholtz, who was with him in the car, had an apartment, and staid there with a Mr. Funkhauser, who had a room in the same house though not in the same apartment, until the next morning, when he accompanied Mrs. Eicholtz, her daughter, a Mrs. Rodgers, and Funkhauser, to Lancaster, and returned to his home the following night at about nine-thirty o'clock.

There is other evidence in the case which indicates that Mrs. Wendel had reached that period of life when certain constitutional changes affected her general health, and that her ill health may have made her nervous and irritable.

It may be conceded, for, without referring to it in detail, in our opinion the record supports the concession, that Wendel supported his family generously according to his ability and resources, and that Mrs. Wendel was not justified in refusing to live with him at the Park Avenue apartment, unless the facts to which we have referred are sufficient to support the charge that he had been guilty either of legal cruelty or adultery. The controlling question in the case, therefore, is whether they will support either conclusion, and

we will first consider them in connection with the charge of adultery.

In *Dicus v. Dicus,* 131 Md. 89, Judge Urner, speaking for this court, said: "It is not necessary, and it is usually imposssible, that direct evidence of the fact of adultery shall be offered. The offense may be proven by circumstances which justify the inference of guilt. *Shufeldt v. Shufeldt,* 86 Md. 529; *Thiess v. Thiess,* 124 Md. 295; *Kremelberg v. Kremelberg,* 52 Md. 553; *Rasch v. Rasch,* 105 Md. 506; *Robins v. Robins,* 121 Md. 695." Although "it is well settled that where the facts relied on to prove adultery may as well import innocence as guilt, they must be held to import innocence." *Thiess v. Thiess,* 124 Md. 297. And the mere fact that a woman accepts marked attention from a man other than her husband, in spite of the latter's objection, is not in itself sufficient to prove adultery. *Rictor v. Rictor,* 139 Md. 697; *Thiess v. Thiess, supra.* But while that is true, "it is not necessary in cases of this character that there be any one act proven which is conclusive of guilt, but the court must consider the opportunity for the commission of the act, the conduct of the parties, and all circumstances, and then determine from the whole testimony whether it should convince unprejudiced and cautious persons of the guilt of the parties." *Shufeldt v. Shufeldt,* 86 Md. 528. Again in *Sterling v. Sterling,* 145 Md. 635, this court, through Judge Digges, said: "The nature of the act is such that it is usually accomplished in a secret and clandestine manner, and rarely in the presence of an eye witness. As above stated, there is no direct proof in this case of the adultery charged, nor is such proof necessary; the law does not require proof of the adulterous act beyond a reasonable doubt. The burden of proof is on the complainant, and he must prove the facts upon which the charge rests with certainty, and the evidence of these facts must be clear and convincing, but when the facts and circumstances surrounding a particular case are so established, the court will draw from them such inferences as the every-day experience and observation of mankind will justly warrant." In *Keezer on Marriage and Divorce,* par. 244, it is said that,

while direct evidence of adultery is not required, "but there must be shown the opportunity for the act and the will to commit it. Mere imprudence, indiscretion, or folly, is not conclusive evidence. Mere evidence that there was an opportunity for illicit intercourse is held to be insufficient. Two facts must be established, a criminal disposition or desire in the minds of both, and an opportunity to commit the crime. There must be some accompanying circumstances which fairly induce the belief that the residence of the parties under the same roof, if they do so reside, was not for a proper purpose." From these statements, which constitute a sound and accurate exposition of the law, it may be stated as a general rule that, to support a finding of adultery upon circumstantial evidence, it is essential that such evidence prove clearly and convincingly (1) a disposition on the part of the adulterous spouse and the paramour to commit adultery, and (2) an oppportunity to commit the offense.

That Wendel and Mrs. Eicholtz had repeated opportunities to commit the offence cannot well be doubted, and in our opinion it may be fairly inferred that they were disposed thereto.

Notwithstanding the fact that marital relations between him and his wife had long ceased, Wendel admitted having in his pockets contraceptive devices, and while he attempted to explain his possession of them, his explanation is entitled to slight consideration, not only because of its character, but because he failed to call the only witness who could have corroborated it, had it been true. He also admitted that hairpins could be found anywhere in his machine, but explained that on the ground that they may have belonged to his wife, which was rather improbable, in view of the fact that she had not been in it for nearly a year. He admitted visiting Mrs. Eicholtz in her apartment frequently, as often as fifty times in 1926, and remaining there at times alone with her there until nearly midnight; he admitted taking long drives with her in the open country; and he and she were on occasions alone in an automobile at night on roads in the open country. Mrs. Eicholtz not only tolerated these

attentions, although she knew that he was married, but, when Mrs. Wendel found her alone with Wendel in his car after midnight, she attempted no explanation of her presence there then or later, but fled.

And humiliating and shocking as that experience must have been to one of normal sensibilities, it apparently had not the slightest effect upon her relations with Wendel, which went on as before. Whilst there is no evidence of any expression of affection between her and Wendel, or of any overt acts of familiarity between them, and while each disclaimed any feeling but that of friendship for the other, their conduct was more convincing than any words could have been. It is incredible that any woman with any reputation to lose would have risked it by receiving the constant and assiduous attentions of a married man, by entertaining him alone until nearly midnight at her apartment, and by travelling at all hours of the day and night in the city and in the open country alone with him, unless constrained by an illicit passion. As we have repeatedly said, to justify a finding of adultery the evidence should be clear, convincing, and inconsistent with any probable inference of innocence. But where the facts are convincingly shown, and the inference therefrom obviously and inevitably point to guilt, it is the duty of the court to so find. And after a most careful scrutiny of the evidence in this case, we have been brought to the conclusion that no proper or legitimate inference can be drawn from the facts established therein, but that the appellant has been guilty of adultery, and that therefore the trial court properly decreed that the appellee was entitled to receive permanent alimony from her husband. *Walker v. Walker, supra; Polley v. Polley, supra; Heinmuller v. Heinmuller, supra.*

As a necessary corollary of that conclusion it follows that the appellant was not entitled to maintain his cross-bill, and that it was properly dismissed. 9 *R. C. L.* 390; *Green v. Green,* 125 Md. 143.

The remaining question submitted by the appeals is whether the trial court erred in fixing the amount of alimony

and counsel fees to be paid the appellee. Considering the income and resources of the appellant, his probable expenses, and his obligation to support his daughter, and considering too the resources of his wife, we feel that the allowances made by the chancellor both as to counsel fees and alimony were eminently just and proper, and we see no reason to disturb them. The decrees appealed from will therefore be affirmed.

*Decrees appealed from in Nos. 33 and 34, October Term, 1927, affirmed, with costs.*