## LESLIE G. TAYLOR *vs.* HELEN G. TAYLOR.

*Bill Asking for Alimony Without Divorce—Abandonment—Insufficient Evidence—Alimony and Counsel Fee Pendente Lite.*

Equity has jurisdiction to decree the payment of alimony to a wife, although she neither asks for nor is entitled to a decree for divorce.

The living together of a husband and wife is so obviously normal and essential to the maintenance of the marital relation, that the law will not encourage their separation by granting alimony to a wife when living apart from her husband, except when he has abandoned or deserted her, or has been guilty of such cruel or vicious conduct that she cannot with safety or decency consort with him. To justify the living apart of a married couple the causes must be grave and weighty and such as render the performance of the marital duties impossible.

If a husband's vicious conduct is such as to force his wife to leave him, or he refuses to permit her to return to his house, his conduct amounts in law to an abandonment of her by him.

A bill by the wife, living apart from her husband, asking for alimony but not for divorce, charged that he abandoned her by deceitfully inducing her to make a visit to her parents and then refusing to permit her to

return to his home, and that he had subsequently failed to support her. The evidence examined, and *held* to show that the plaintiff was not justified in leaving the defendant on account of his cruelty or misconduct, that the defendant had repeatedly requested the plaintiff to return to him, and that she had made no effort to do so, and that, since the charge of abandonment made by the bill is not supported by the proof, the plaintiff is not entitled to alimony.

Under a bill for alimony it is proper for the trial Court, before hearing and final decree, to award to the plaintjff alimony *pendente lite*, and a counsel fee.

*Decided May 13th, 1908.*

Appeal from the Circuit Court for Cecil County (CROTHERS and ADKINS, JJ.)

The cause was argued before BOYD, C. J., SCHMUCKER, BURKE and WORTHINGTON, JJ.

*John Prentiss Poe,* for the appellant.

*L. M. Haines* and *George A Blake,* for the appellee.

SCHMUCKER, J., delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court for Cecil County requiring the appellant to pay to the appellee, who is his wife, an annual sum as alimony during the term of her natural life.  The appellee has been living apart from her husband since a date anterior to the institution of the present suit, but she neither asked for nor obtained a divorce from him *a vinculo* or *a mensa et thoro*.  The object of her suit was simply to secure the payment to her of alimony and the decree awarding it left the marital relation and *status* of the parties unimpaired in all other respects.

The power of a Court of chancery in Maryland to entertain an application by a wife against her husband, on sufficient grounds, for alimony is undoubted.  As recently as in the case of *Stewart* v. *Stewart,* 105 Md. 297, we said, speaking through JUDGE PEARCE, "From a period before the Revolution however the Court of Chancery in this State had full jurisdiction in cases of alimony though no divorce had been de-

creed or was asked for, and though the case made by the bill and proof would not according to the Ecclesiastical Courts in England entitle her to a divorce *a mensa et thoro.*" The question before us in this case is simply whether the record shows the existence of proper grounds for the relief for which plaintiff asks.

It appears from the record that the parties were married on June 25th, 1902, and lived together at Perryville in Cecil County until November 4th, 1903, when the wife returned to the house of her parents where she has ever since then resided. The bill of complaint does not charge the husband with infidelity or with physical violence toward his wife, or the infliction upon her of bodily injury or hardship, or with any coercion, or restraint of her personal liberty, nor even with a failure to support her so long as she lived with him. The substantial charge upon which the suit is founded is that he abandoned her at the time of their separation on November 4th, 1903, and has since then failed to support her.

It is not averred in the bill that he himself left the marital domicile and refused to return to it. The abandonment is alleged to have been accomplished through deceit on his part by inducing her to visit her parents and then refusing to permit her to return to his home. It is also alleged that the abandonment thus accomplished was the culmination of a long cherished desire and purpose on his part to get rid of her, made more and more apparent by an increasing indifference to her and by speech and conduct at times unmanly, harsh and cruel by which her life was rendered miserable. The answer of the husband while admitting the occurrence of many of the facts mentioned in the bill, categorically denied the existence of any desire or intention on his part to get rid of his wife or the practice by him of any deceit to induce her to leave his home or a refusal to receive her back after she had left. On the contrary it averred that after she voluntarily left his home and returned to her father he had written her an affectionate letter, entreating her to return to him and asking her forgiveness if he had been hasty and offering to forgive her for her

past shortcomings, to which she made no reply.   The answer further protested that he had been a kind and faithful husband in all respects and asserted that his wife had been overbearing, imperious and obstinate in the extreme in her demeanor toward him.

Both of the parties to the suit went upon the stand and testified at length giving versions of their marital experiences, which failed to agree in details and were especially conflicting in that each of the participants attempted to throw upon the other the blame for many heated and sometimes bitter quarrels over matters of slight importance, all of which might have been avoided by the exercise of that mutual forbearance which the state of matrimony demands of those who enter its portals. This testimony was supplemented by that of friends and neighbors of the litigants which fails to entirely corroborate the accounts given by either litigant of the material facts of the case.   The whole evidence in the case fills almost four hundred pages of the record.   It presents a lamentable disclosure of the petty bickerings of a young married couple which should never have found its way into a Court of Justice. We have patiently gone through this mass of testimony, but we will not encumber our opinion with more than a statement of our conclusions from it with a reference to some of the facts, material to the issue, which we regard as established by it.

It appears from the evidence that the parties to the suit are educated and intelligent persons who might well be expected to appreciate the obligations and duties of married life.   The appellant was at the time of the marriage and still is a regular practicing physician in the enjoyment of a practice adequate for the maintainance of his family in modest comfort.   The appellee was a school teacher prior to her marriage.   Their married life seems, in the main, to have been an agreeable one and to have produced the impression upon some at least of their neighbors who saw them often that they were a congenial couple.   The husband provided the family maintainance in accordance with his means and the wife displayed industry and fidelity in the conduct of the domestic establish-

ment. Unfortunaiely he was rather petulant in disposition
and unstable in purpose and she was high tempered and
easily provoked. The possession by them of such personal
traits is sufficient to account for most of the acute but transient
quarrels which marred their domestic peace. It is but fair to
the wife to say that the record shows that the husband, at
times manifested an indifference to her and at other times
chafed under the burden of providing for the family and made
known his discontent, to her humiliation and chagrin. He
must, however, have treated her well as a rule for she herself
said of him in her direct testimony: "Generally when he had
these tantrums, when he would get over them he was as nice
as anything could be," and she repeated the statement in her
cross examination. It further appears from the record that
in April, 1903, after the occurrence of most of the petty
quarrels between the husband and wife mentioned in the evi-
dence, there was a family conference over their affairs at which
his mother and his wife's parents were present that resulted in
mutual apologies and a complete reconciliation between them.

These occasional breaks in the harmony of the marital life
of the parties to this suit, even thongh they be chargeable to
the husband's conduct, do not in our opinion exhibit such
cruelty or ill treatment by him of his wife as to justify their
living apart from each other. *A fortiori* do those occurrences
afford no sufficient ground for that judicial recognition of the
propriety of such living apart, which would be implied by
granting her a decree against him for permanent alimony.
Marriage is more than a mere civil contract for the establish-
ment and maintainance by the parties to it of certain relations
to each other. It involves, except in so far as it has been
modified by statute, an intimate personal union of those par-
ticipating in it, of a character unknown to any other human
relation, and it creates a civil *status* the maintainance of which
in its full integrity is vital to the moral welfare of society.
Many States, of which Maryland is one, have conferred upon
their Courts of equity the power of decreeing an absolute or
partial dissolution of marriages but that power is permitted to

be exercised only for grave causes and in specified methods. . The living together of the husband and wife is also so obviously normal, and essential to the maintainance of the marital relation and *status*, that the law will not encourage their separation by granting alimony to a wife when living apart from her husband except when he has abandoned or deserted her or has been guilty of such cruel or vicious conduct that she cannot with safety or decency consort with him.   To justify, the living apart of a married couple the causes must be grave and weighty and such as render the performance of marital duties impossible.   *Hewitt* v. *Hewitt*, 1 Bl. 101; *Helms* v. *Franciscus*, 2 Bl. 568; *Jamison* v. *Jamison*, 4 Md. Chy. 294; *Schindel* v. *Schindel*, 12 Md. 315; *Childs* v. *Childs*, 49 Md. 509; *Hawkins* v. *Hawkins*, 65 Md. 104.

We do not think the charge of abandonment, made by the bill against the husband, is supported by the evidence.   It is settled that, if he forced her to abandon him by his vicious conduct or induced her to do so by fraud and deceit and refused to permit her to return, his conduct would have amounted in law to an abandonment of her by him.   *Harding* v. *Harding*, 22 Md. 337; *Levering* v. *Levering*, 16 Md. 213. He is charged in the bill with having deceitfully and with the purpose of getting rid of her induced her to pay a visit to her father's residence on November 4th, 1903, and then refused to permit her to return home.   The testimony, as to the circumstances of her leaving her husband's domicile on that occasion, is full and there is a substantial agreement between the accounts given by the different witnesses as to the important features of the occurrence.

For some days prior to November 4th the plaintiff had been suffering much pain and distress from the result of a surgical operation which had been performed by her husband on one of her feet for the removal of an ingrowing toe nail. The discharge by her of household duties required her to be in such constant motion as to aggravate the condition of her foot and cause her much suffering.   On the morning of the 4th the condition of her foot was such that, at her husband's sugges-

tion, she remained in bed and his mother, who lived with them, prepared the breakfast. During a discussion between them early on that day, of her disabled condition, it was proposed and agreed to that she pay a short visit to her parents, who resided less than two miles away, and take a rest so as to give her foot a chance to get well. The husband testified that the wife proposed the visit and he consented to it, while she testified that he proposed it saying that he could come to her father's and attend to her foot and she reluctantly gave her consent. It was arranged that her husband was to drive her over to her father's. Her departure was delayed in order that she might consult her father, who was expected to call during the morning in reference to the proposed visit to his house. The father came as expected and expressed pleasure at the anticipated visit of his daughter.

Before the start for the father's house was made, a heated altercation over a trifling matter occurred between the husband and wife with the result that he refused to drive her over to her father's, although he had hitched up the horse for that purpose. The daughter not arriving at her parents' home as soon as expected, her father came for her and took her home with him. As she was preparing to start with her father her husband, changing his attitude toward the proposed visit, told her, as she says, that she could go but if she went she could not return to his house. Her account of his action in that respect is as follows: "He said 'the horse is ready but remember if you go out of this house today you will never come back in it.' I said what do you mean by that. He said 'I mean just what I say, if you go out of this house today you will never come back in it.'" She further testified that just before starting for her father's she said to her husband "George I think I'll go up home for a little while until my foot gets well. He said 'very well you know what I told you.' I said to Mrs. Taylor (the husband's mother) George don't seem to want to take me. I think I'll go up home and stay until my foot gets well. She said 'very well you know what George told you.' Pretty soon we went out." The wife further tes-

tified that she intended to stay but a short time at her father's,
and thought that her husband would get in a better humor
and she would then come back, that when he came up to her
father's to see her foot she would coax him to take her back,
that he would come and take her before her foot got well,
and not leave her there too long, that she had no idea
when she left her husband's house that he was turning her
out, that both he and she expected her to go to her father's
to get a rest.    The account of the wife's leaving her home,
given in the testimony of the husband and his mother sub-
stantially agrees with that of the wife except that they both
say he did not tell his wife that if she went to her father's she
could not return, and he asserts that he promised to go to her
father's and treat her foot only in case she asked him to do so.

After the wife had gone to her father's, she and her hus-
band, perhaps still smarting under the tiff which preceded her
leaving home, behaved like two peevish children, and she did
not ask him to come to see her and he did not go.    After a
few days her father, thinking that her foot required medical
attention, employed another physician to care for it.

On November 18th, 1903, after two weeks of mutual silence
the husband acting, as he says, under advice of counsel in-
serted in several newspapers in Cecil County a notice warning
the public not to give his wife credit as she had left his bed
and board without just cause.    In the notice he described his
wife by her maiden name.    That naturally aroused her indig-
nation and tended to widen the breach between them.

On December 3rd, 1903, the husband wrote and sent to
the wife by a special messenger a letter, of which he preserved
a copy, proposing a reconciliation between them, to which she
sent no reply.    The letter was as follows:

"My dear Wife.

Your home is with me and I want you to come back and
make it home like.    Let the past be forgotten and start over
again.    I see no reason why we can't live happily together
and make confidants of each other.    I am willing to do my
part if you are yours.    I feel satisfied if we can have a talk
alone matters can be adjusted.    You know I begged you not
to leave and have been sorry ever since that you did.

Helen, come back, forgive me if I have been hasty, as I will
you, and we will stand by each other and this experience
perhaps may do us good and we will fight life's battles once
more hand in hand.

                    Yours with much love,
Perryville, December 3d."                              George.

This letter, in view of the transactions which preceded it and
the method of its delivery, may be regarded as suspiciously
fervid in tone and as protesting too much, but it contains a
definite proposition for mutual forgiveness and reconciliation,
and a positive request to the wife for a full restoration of con-
jugal relations, and it should have received a reply from her.

Between three and four weeks after the sending of this letter
the husband and wife met by accident on the public road.
She was driving in a buggy and he was on foot.    According
to her account of the interview which followed, she stopped
her horse and he walked from the side walk to her buggy
and asked her if she got his letter.    She replied that she had,
and begged him to get into the buggy with her and go up to
her mother's and she felt sure that matters could be adjusted
between them.    He declined to go there because he said her
mother had told him he should never darken her door again.
He also refused a proposal to go to her lawyers to talk it over.
He then asked her if she would come back to live with him
and she replied that she would under conditions, and when
asked by him what the conditions were she said she did not
want to live with his mother but did not say that she would
not do so.    She further testified that she would have been
glad of the chance to have returned to him at that time.    The
husband in his account of the interview with his wife on the
public road admits that he refused to go with her to her
mother's to talk over their affairs but says that he offered to
get into the buggy with his wife and go around to their own
home and talk their matters over there but she refused.    The
wife in her cross-examination admits that her husband made
that offer to her, and also said that she thought she had ob-
jected to going, and further said that she thought she would
have gone with him if he had not gotten angry and turned

away as he did when she objected to having his mother live with them.

After that interview no further overtures toward a reconciliation were made by either party but their affairs remained in *statu quo* until the present suit was brought on July 18th, 1904.

The evidence fails to sustain the alleged abandonment of the wife by the husband. Even according to her own version of their parting, she left his house deliberately after being warned that if she did so she could not return, while according to his account she went against his wish and request although she had his permission to go. Assuming that she left under a misunderstanding between them there was no evidence that she has made a single serious offer or effort to return to him or given a favorable response to his several requests to her to come back. Even if she doubted the sincerity of his letter of December 3rd, 1903, it contained so plain a request to forget the past and start afresh their living together that it was her duty to at least to test his sincerity by a favorable response to his request. She should also have yielded a ready assent to his subsequent offer to go with her to his home and talk over their affairs with a view to a reconciliation. Nor does she aver or prove that she ever requested him to provide a suitable maintainance for her after their separation and was met with a refusal. Having, in our judgment, made out no title to the permanent alimony for which she asks, the decree in her favor for that relief must be reversed.

At an early stage of the case the appellee as plaintiff made an application for an allowance of *alimony pendente lite* and a counsel fee and the Circuit Court passed an order requiring her husband to pay her a counsel fee of one hundred dollars and alimony *pendente lite* at the rate of fifteen dollars per month. Without again reviewing the leading features of the case it is sufficient to say that we regard the passage of that order as proper and in accordance with the practice of Courts of equity in suits of this character and it will not be disturbed.

*Final decree appealed from reversed*
*with costs.*