## FRANK B. WALKER

*vs.*

## MARGARET D. WALKER.

*Divorce: foreign states; jurisdiction; bona fides of residence.*

Where a party leaves the State of Maryland, where he was married and had his matrimonial domicile, with a view and sole purpose of obtaining in another State a divorce from his wife, without any intention of abandoning his domicile in Maryland, or of becoming a resident of the other State for any purpose other than for the divorce, but with a well-defined intention of returning to Maryland as soon as his object is attained, he does not acquire a *bona fide* domicile in the other State, and the courts of that State do not acquire jurisdiction to grant him a divorce; such a decree, so given, would be a glaring and deliberate fraud on such Court, and is not one which should be recognized in Maryland, either under the "full faith and credit clause" of the Constitution of the United States or under the principles of comity.                                    p. 665

*Decided April 9th, 1915.*

Appeal from Circuit Court No. 2 of Baltimore City. (AMBLER, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Henry H. Dinneen* (with whom was *George P. Bagby* on the brief), for the appellant.

The cause was submitted on brief by *Thomas C. Weeks* and *Harry B. Wolf,* for the appellee.

THOMAS, J., delivered the opinion of the Court.

The bill in this case was filed by the appellee against the appellant in Circuit Court No. 2 of Baltimore City, on the 13th of July, 1914, for alimony, counsel fee and the custody of their child.

The evidence shows that the plaintiff and defendant were married in Baltimore City in July, 1907, and have one child, Frances B. Walker, who on the 29th of March, 1914, was seven years of age. Immediately before the marriage, which took place in an attorney's office while certain proceedings were pending against the defendant, they entered into the following agreement:

"This agreement made this 11th day of January, A. D. 1907, by and between Margaret E. Doyle and Frank B. Walker, her intended husband, both of Baltimore City and State of Maryland:

"Whereas a marriage is intended shortly to be solemnized between the said Margaret E. Doyle and Frank B. Walker, in view of which they desire to provide for the income and support to be received by the said Margaret E. Doyle after the said intended marriage as the sole support to be given her for herself and the issue of said marriage:

"Now, therefore, this agreement witnesseth, That in consideration of the said intended marriage the said Margaret E. Doyle shall, after said intended marriage, possess and enjoy all property real and personal which she may now or shall hereafter hold free from any claim or interest of the said Frank B. Walker and with full power to her to dispose of the same by deed or otherwise without the help or hindrance of him, the said Frank B. Walker.

"And in consideration of the agreement in the paragraph last above recited it is understood and agreed that the said Frank B. Walker shall, after said intended marriage, possess and enjoy all property real and personal which he may now or shall hereafter hold, free from any claim or interest of the said Margaret

E. Doyle, and with full power to him to dispose of the same by deed or otherwise without the help or hindrance of her, the said Margaret E. Doyle. And the said Frank B. Walker, in consideration of the said intended marriage, hereby covenants and agrees with the said Margaret E. Doyle, his intended wife, that from and after their marriage he will give to her for her support and the support of their issue, the sum of ten dollars per month during the continuance of said marriage; the same to be paid to her between the 1st and 10th days of each and every month, and the said Margaret E. Doyle, his intended wife, is to receive said sum as the sole support for herself and her issue to be paid by or demanded of the said Frank B. Walker by her, the said Margaret E. Doyle, after her said marriage or anyone for her or in her behalf.

"As witness our hands and seals.

Margaret E. Doyle.    (Seal)

Frank B. Walker.    (Seal)

Test—William McCawley."

The plaintiff and defendant never lived together after their marriage, although the plaintiff says she "repeatedly wrote to him and urged him to live as man and wife should live" for their "baby's sake." The plaintiff and their child have always lived with her brother's family in Baltimore City. The defendant, whose home was in Maryland, and who held a position in the Internal Revenue Department of the United States, for the District of Maryland, at a salary at from three to four dollars per day, continued to pay the plaintiff the ten dollars per month until the 7th of May, 1913. On the 13th of February, 1913, he wrote her from Cumberland, Maryland, where he was then stationed, as follows:

"My Dear Margaret: I have made arrangements to be in Baltimore on Sunday, February 16th, 1913, and will stop at the Caswell Hotel. If you will inquire for me there about 11 A. M. I have something to say to you regarding our future which, I am sure, will interest and satisfy you. In event you should not

be able to keep this appointment, telegraph me before
3 o'clock Saturday.

"Hoping we may be able to reach satisfactory un-
derstanding, I remain,

Sincerely,

F. B. Walker."

As requested in this letter the plaintiff met the defendant
at Hotel Caswell. After greeting her and inquiring about
the family, he asked her if she had been reading about the
laws to be enacted in the western states, and said, "I do not
know whether you have been reading up on them, but I have;
and after a short time the required residence out there will
be twelve months, but now it is only six months, and I have
a little paper drawn up by an attorney, and I want you to
read it over; a little proposition. I feel I have not done right
in this matter and I voluntarily offer this proposition."
After some further talk she says he left the parlor and got
his coat and hat and they went to Camden Station where they
remained until after ten o'clock, during which time he showed
her the proposed agreement and told her that if she "did not
appear and have a divorce in this State, he could not obtain
a divorce in this State," and if she did not sign the agree-
ment he would leave the State and go to some other State
where he could get a divorce. They did not sign the paper,
but he gave her a copy of it which she took home, and she
says that she never saw him again until during the trial of
this case. The proposed agreement was as follows:

*"Synopsis of Substituted Agreement Between Mr.*
*and Mrs. Walker.*

"In lieu of the agreement now existing between the
above parties, and in substitution thereof, it is agreed
on the part of Mr. Walker as follows:

"(1) To pay and deposit in some trust company of
Baltimore City approved by Mrs. Walker the sum of
. . . . . . . . . . dollars, on or before the 15th day of each
and every month, for a period of ten years, account-
ing from the date of said substituted agreement.

"(2) To give bond, with security to be approved by Mrs. Walker, in the penalty of two thousand dollars, for the faithful and prompt payment of said monthly sum of money to said trust company.

"(3) That said deposits shall bear interest at the rate of three per cent. per annum, and the full amount of said deposits and interest, to be held by said trust company in trust for the benefit of Frances B. Walker, and at the expiration of ten years the principal so paid to said trust company, together with the interest thereon, to be applied to the education of the said Frances B. Walker, in any school or college which the said Mrs. Walker may select.

"(4) In the event of the death of the said Frances. B. Walker before the expiration of said ten years, said money so paid to said trust company, together with the interest thereon, shall become the absolute property of the said Mrs. Walker, and the aforesaid payments shall continue to be made by the said Mr. Walker for said period of ten years, and no longer, whether the said Frances B. Walker shall live or not, and all payments made after the death of the said Frances B. Walker, if she should die, shall be the absolute property of the said Mrs. Walker.

"(5) Mr. Walker further agrees to pay all expenses required by law to be paid, together with attorneys' fees (the lawyer or lawyers to be selected by the said Mr. Walker), incident to a suit to be brought immediately after the execution of said substituted agreement by the above named parties, by the said Mrs. Walker against Mr. Walker, to procure a decree of absolute divorce from him on the ground of desertion.

"Mrs. Walker agrees as follows:

"(1) In consideration of the aforegoing to be done by Mr. Walker, promptly after the execution of a substituted agreement, to bring suit in her name, through an attorney or attorneys to be selected by Mr. Walker, against Mr. Walker for the purpose of procuring a

decree of the Court divorcing her *a vinculo matri-monii* from Mr. Walker.

"(2) That she will not in said suit ask for tempo-rary or permanent alimony from Mr. Walker, the aforementioned payments to be made by Mr. Walker being in lieu of any and all alimony or claims on the part of Mrs. Walker against Mr. Walker.

"(3) That she will testify as party plaintiff in said divorce suit, upon being called upon to do so, and will do everything reasonably in her power to prosecute said suit to a final decree of divorce."

In March, 1913, the plaintiff received the following letter from the defendant:

"Cumberland, Md., March 20, 1913.

"My Dear Margaret: I learned with a great deal of regret of your indisposition, and while I would have been sorry to hear it at any time, I am particu-larly sorry that it should have occurred just at this time. I have been looking forward to your promised letter, but it has not come, and as it has been over a month since I talked with you, I am sure you have had ample time to consult your friends and make your decision. Please bear in mind that the time grows shorter each day and, in fact, has become quite lim-ited. If you are too ill to write me, have someone telegraph, but in either event I must have an answer positively by the 24th. Remember, also, that as you haven't kept your bargain, you must not expect me to do some of the things which I promised. I am in earnest, and from a personal standpoint it does not make any difference to me either way, only for the reasons which I gave you in Camden Station.

"Hoping that your reply may not be too late, I am,
Sincerely,
Frank B. Walker."

The plaintiff says that the statement in the letter "that the time grows shorter" referred to the time within which

he had to leave Maryland in order to acquire the required six months residence in the western State.

On the 25th of May, 1913, the defendant left the State of Maryland and went to Salt Lake City and from there to Reno, Nevada. He did not resign his position in the Internal Revenue Department, but "got permission to be absent," and resumed his work there when he returned to Maryland on the 24th of June, 1914. He says he had a friend in Salt Lake City, who was a miner and whom he had met in Pittsburg about a year previous, and that he stopped off there with the view of getting a position. He could not tell, however, where his friend lived, in what building his office was or on what street it was located. He was in Salt Lake City for three or four days and then went to Reno because he was told that he would have no trouble in finding employment there. He stayed in Reno from the 27th of May, 1913, to March, 1914, when he returned to Maryland. While he was there he "worked around with different people," and made enough money to pay his board. When asked to state what he did he said that he worked with a repair gang on the Southern Pac. Railroad, and kept books at night for a drug company, which paid him four dollars a week. The defendant offered in evidence the record of a divorce proceeding in the Second Judicial District Court of the State of Nevada, for Washoe County, instituted by him against the plaintiff, and the statutes of Nevada, etc., relating to marriage and divorce. These statutes provided that a divorce might be obtained in the District Court of the county in which the plaintiff had resided for six months before suit, for "willful desertion at any time, of either party by the other, for the period of one year," and that if the defendant was a non-resident or could not, for any cause, be personally summoned, the Court could order notice of the suit to be given in such manner as should appear most likely to convey knowledge of the suit without undue expense or delay, and, upon failure of the defendant to appear and defend the suit, to decide the case. The record in that case

shows that the bill was filed by Frank B. Walker against Margaret E. Walker on the 6th of December, 1913, alleging that the plaintiff was then an actual resident of Washoe County, Nevada, and had been for six months previous to the institution of the suit; that the plaintiff and defendant were married on the 11th of January, 1907; that they had one child, Frances B. Walker, and "that the defendant has wilfully deserted the plaintiff for a period of more than one year immediately preceding the commencement of this action; that the said desertion was and is without the consent and against the will of the plaintiff, and that the defendant still continues to so desert plaintiff." On the same day an order was passed by the Court authorizing the following summons to be served on the defendant:

"The State of Nevada sends greeting to said defendant: You are hereby summoned to appear within ten days after the service upon you of this summons if served in said county, or within twenty days if served out of said county, but within said Judicial District, and in all other cases within forty days (exclusive of the day of service), and defend the above entitled action. This action is brought to recover a judgment and decree of divorce forever dissolving the bonds of matrimony now existing between you and the plaintiff, described in complaint dated this 6th day of December, A. D. 1913.

(Seal)                    W. A. Fogg, Clerk,
            Of the Second Judicial District Court
            of the State of Nevada in and for
            Washoe County."

On the 28th of February, 1914, the summons was returned with an affidavit of service on Margaret E. Walker, on the 8th of January, 1914, in the State's Attorney's Office in the Court House in the City of Baltimore, by Charles Kleinjohn, "Deputy Sheriff," and on the same day the District Court of Nevada passed a decree, reciting the default of the defendant, that evidence had been offered in support of the

allegations of the bill, and dissolving the marriage between the plaintiff and defendant, and on the 2nd of March, 1914, there was filed what is called the "Judgment Roll," containing the findings and decision of the Court on the 28th of February, 1914.

The defendant further testified that he went west in order to be in a dry country, and not for the purpose of securing a divorce; that he knew when he left Maryland and went to Reno that the law then in force in Nevada required a residence there of six months in order to secure a divorce; that the law was changed in January or February, 1914, and that he came back to Maryland because he learned that his mother, who lives in Easton, Maryland, was sick. Charles Kleinjohn testified that he served the summons on Mrs. Walker in the Court House in Baltimore City, and that she was pointed out to him by Charles Kohlman, a detective; that she refused to take the paper and he shoved it under her arm. Charles Kohlman states that he was with Charles Kleinjohn when he served the summons on Mrs. Walker; that he knew her from what the assistant State's Attorney had told him, and that he saw her about a half hour later coming out of Mr. Wolf's office.

Mrs. Walker states most positively that no paper was served on her, and that the first information she had of the divorce proceedings was a notice of the divorce in the Sunday American of the first Sunday after March 2nd, 1914; that she did not know Charles Kleinjohn, and that she had never been summoned to attend Court in her life. Her sister, who was at the Court House in Baltimore on the 8th of February, 1914, says that she went there with Mrs. Walker, who went before the Grand Jury, and that while she was there, and as she was walking through the corridor, a man approached her and asked her if she was Margaret E. Walker, and that when she told him that she was not, he put a paper on her muff and it fell on the floor, and that she has never seen the paper or the man since.

Upon this evidence the learned Court below held that the

decree of the District Court of Nevada, offered in evidence, was "ineffective for want of jurisdiction to bind the parties in these proceeding," and on the 3rd of December, 1914, passed a decree awarding the plaintiff alimony and a counsel fee. From that decree the defendant has brought this appeal.

The appellant, in a very carefully prepared and elaborate brief, contends:

"First. The plaintiff failed to prove abandonment, which is the sole basis of the suit.

"Second. The ante-nuptial agreement in connection with the lapse of time between its execution and the alleged abandonment, during which period (6 years) the parties lived apart and the appellant made regularly to the appellee the payments called for by said agreement, and coupled with the fact that it was only when such payments ceased that the charge of abandonment was made, is a bar to this suit.

"Third. The decree of the District Court of Nevada for Washoe County divorcing the defendant from the plaintiff is, under the 'full faith and credit' clause of the Federal Constitution, a complete defense to this suit."

In support of the first and second propositions the appellant relies upon cases like the case of *Gill* v. *Gill,* 93 Md. 652, where this Court, quoting from *Bishop on Marriage and Divorce,* sec. 1662 and 1663, said: "Desertion as a matrimonial offense, is a voluntary separation of one of the married parties from the other, or the voluntary refusal to renew a suspended cohabitation, without justification either in the consent, or the wrongful conduct, of the latter," and the case of *Barclay* v. *Barclay,* 98 Md. 366, where the Court held "that a deed of separation followed by a living apart by mutual consent together with the lapse of time constituted a bar to the wife's demand for a divorce on the ground of desertion" where the suit was not brought until the husband refused to contribute to her support according to the terms of the deed.

These contentions, however, lose sight of the important and distinguishing features of this case, namely: the agreement

between the appellant and the appellee does not expressly provide that they shall live apart; the plaintiff states without contradiction that she repeatedly urged the defendant to live with her as man and wife should live, and this is not an application for a divorce.

As early as the case of *Wallingsford* v. *Wallingsford*, 6 H. & J. 485, alimony, in this State, was declared to be "a maintenance afforded to the wife, where the husband refuses to give it, or where from his improper conduct she is compelled to live separate from him," and this definition has never been departed from in any important particular. *Keerl* v. *Keerl*, 34 Md. 21. In the case of *Brown* v. *Brown*, 5 Gill, 249, where the decree was affirmed for the reasons stated by the Chancellor, CHANCELLOR JOHNSON said: "The parties we have seen, on the 18th of April last executed a deed of separation, by which provision was made for the support of the wife and children, and by which these parties mutually agreed during their joint lives, to live separate and apart from each other. This deed, so long as the terms of it are complied with on the part of the husband, exonerates him from the obligation to support his wife, and is a protection against any claim which can be made upon him for supplying her even with necessaries," and in the case of *Barclay* v. *Barclay, supra,* JUDGE PEARCE repeats the statement in *Brown* v. *Brown,* that "so long as the terms of a deed of separation are complied with by the husband, he is exonerated from the obligation to support his wife, and is protected against any claim which may be made upon him for supplying her even with necessaries," and then adds "and it follows from this that when he repudiates his obligation under such deed, his liability for her maintenance is revived." In the recent case *Schnepfe* v. *Schnepfe,* 124 Md. 330, CHIEF JUDGE BOYD quotes with approval the statement in *Schuler on Husband and Wife,* sec. 367: "There is this difference pointed out between promises and agreements in consideration of marriage, and all other agreements; namely, that the contract though broken by one of the parties, remains binding

upon the other. The reason for this is that such promises and agreements affect not only the rights of the married pair, but those of their offspring; * * * But where the performance is sought by the defaulting party, the contract cannot be enforced against the person injured through such default." It is suggested by counsel for the appellant that the language of JUDGE PEARCE referred to above had reference to the section of the Code making desertion by the wife a criminal offense, and that the statement adopted by CHIEF JUDGE BOYD does not apply to this case because the appellant is not here seeking to enforce the anti-nuptial agreement. But it is obvious that JUDGE PEARCE was not referring to the criminal liability of a husband for desertion under Ch. 73 of the Acts 1896 and Ch. 44 of the Acts 1904, authorizing the criminal courts to make a part of the fine payable to the wife was not passed until after his opinion was written, and in this case the appellant is seeking to enforce the agreement as a bar to any other allowance to the appellee. We cannot accept the view that a husband, who has agreed to pay to his wife a certain sum per month in lieu of her claim to support and maintenance, can, while deliberately repudiating his obligations under the agreement, rely upon it to defeat her marital rights. It is true this Court has held that "a separation commenced and continued by mutual consent and agreement does not constitute desertion," and "that a voluntary deed of separation between the parties, in connection with lapse of time, and other circumstances, may be sufficient to show that an application for a divorce was not made *bona fide,* but for some collateral purpose." *Barclay* v. *Barclay, supra.* We have also said that alimony alone can only be granted upon grounds sufficient to justify a divorce *a vinculo* or *a mensa. Outlaw* v. *Outlaw,* 118 Md. 498. But we have repeatedly held that a deed of settlement is not *per se* a bar to a suit for a divorce (*Barclay* v. *Barclay, supra.; Lemmert* v. *Lemmert,* 103 Md. 57), and where, as in this case, the bill is for alimony alone, and the husband has refused to live with his wife or to make any provision for her maintenance,

the fact that he entered into an agreement with her to pay her a certain sum per month which he afterwards repudiated, cannot deprive her of her right to relief. His refusal to allow her to live with him, or to provide for her support is in effect a desertion and abandonment entitling her to alimony, and that is what JUDGE PEARCE meant in *Barclay's Case* when he said "that when he repudiated his obligation under such deed, his liability for her maintenance is revived." The suggestion that that case is not open to the construction we have given it because the Court there refused to allow alimony is without force. It does not appear from the report of the case that the bill prayed for alimony, but even if it did it was asked for in connection with a prayer for a divorce, and as the latter could not be granted alimony was not allowed. Here the bill is for alimony alone, and the jurisdiction of the Court is independent of its authority to grant a divorce. *Stewart* v. *Stewart,* 105 Md. 297; *Outlaw* v. *Outlaw, supra.*

This brings us to the third proposition relied upon by the appellant. Courts of Equity in this State exercise jurisdiction in divorce cases where the defendant is a non-resident (Code of 1912, Article 16, secs. 36 and 39), and the "full faith and credit" clause of the Federal Constitution, and the rule of comity has been given full recognition and application in this State in respect to judgments and decrees generally. But the right of the party sought to be bound by such a judgment or decree to challenge the jurisdiction of the Court is equally as well established, and we do not understand it to be questioned in this case. *U. S. Bank* v. *Merchants Bank,* 7 Gill, 429; *Coates* v. *Mackey,* 56 Md. 416; *Glenn* v. *Williams,* 60 Md. 93; *Mundy* v. *Jacques,* 116 Md. 11.

Mr. Bishop in his work on *Marriage and Divorce,* Vol. 2, sec. 50, says: "No Court of a State wherein neither of the parties has a *bona fide* domicil has, in our interstate law, any jurisdiction over their marriage status. The presence of one or both of them, and since the State of their domicil has an

interest in their marriage, the submission of the defendant to the jurisdiction, cannot, singly or together, render the result otherwise. The question has assumed various forms, under varying circumstances, and the conclusion has in all been the same. There must be a domicil, in distinction from a temporary abiding, and the residence must be, in the words of RYAN, C. J., 'actual and *bona fide, animo manendi.'* And whenever the Courts of one State have taken jurisdiction without a domicil, those of the others have pronounced the divorce sentence void." In section 102 he says: "One who goes to another state simply to procure a divorce and return, not intending a permanent change of residence, does not acquire a new domicil; hence his divorce proceeding is a fraud on the Court, and void," and in section 109, he says, "the statutory term 'reside' or 'residence,' including 'inhabitant,' as employed to denote the jurisdiction for divorce, should be rendered to mean the same thing which 'domicil' does in the international law, unless the contrary is affirmatively manifest from the words of the statute. And so our Courts commonly regard the question." In *Cooley's Constitutional Lim.* 494 (6th Ed.), the learned author says: "We conceive the true rule to be that the actual, *bona fide* residence of either husband or wife within a State will give to that State authority to determine the *status* of such party, and to pass upon any question affecting his or her continuance in the marriage relation, irrespective of the locality of the marriage, or of any alleged offense; and that any such Court in that State as the Legislature may have authorized to take cognizance of the subject may lawfully pass upon such questions, and annul the marriage for any cause allowed by the local law. But if a party goes to a jurisdiction other than that of his domicile for the purpose of procuring a divorce, and has residence there for that purpose only, such residence is not *bona fide,* and does not confer upon the Courts of that State or country jurisdiction over the marriage relation, and any decree they may assume to make would be void as to the other party." A like principle is recognized in *Barber* v.

*Barber,* 21 Howard, 582, and in the case of *Haddock* v.
*Haddock,* 201 U. S. 562, MR. JUSTICE WHITE, in delivering
the opinion of the majority of the Court, states as two
propositions "irrevocably concluded by the previous decisions
of that Court; 'Fifth. It is no longer open to question that
where husband and wife are domiciled in a State there exists
jurisdiction in such State, for good cause, to enter a decree
of divorce which will be entitled to enforcement in another
State by virtue of the full faith and credit clause. It has,
moreover, been decided that where a *bona fide* domicil has been
acquired in a State by either of the parties to a marriage, and
a suit is brought by the domiciled party in such State for a
divorce, the Courts of that State, if they acquire personal
jurisdiction also of the other party, have authority to enter
a decree of divorce, entitled to be enforced in every State by
the full faith and credit clause. *Cheever v. Wilson,* 9 Wall.
108.

" 'Sixth. Where the domicil of matrimony was in a par-
ticular State, and the husband abandons his wife and goes
into another State to avoid his marital obligations, such other
State to which the husband has wrongfully fled does not, in
the nature of things, become a new domicil of matrimony,
and, therefore, is not to be treated as the actual or construc-
tive domicil of the wife; * * *. The general rule is, that a
voluntary separation will not give to the wife a different
domiciliation in law from that of her husband. But if the
husband, as is the fact in this case, abandons their domicil
and his wife, to get rid of all those conjugal obligations which
the marriage relation imposes upon him, neither giving to
her the necessaries nor the comforts suitable to their condi-
tion and his fortune, and relinquishes altogether his marital
control and protection, he yields up that power and authority
over her which alone makes his domicil hers." MR. JUSTICE
BROWN in a dissenting opinion in that case says: "Doubt-
less the jurisdiction of the Court granting the divorce may
be inquired into, and if it appears that the plaintiff had not
acquired a *bona fide* domicil in that State at the time of the

institution of the proceedings, the decree is open to a collateral attack, *Bell* v. *Bell,* 181 U. S. 175, and a recital in the proceedings of a fact necessary to show jurisdiction may be contradicted. *Thompson* v. *Whitman,* 18 Wall. 457; *Streitwolf* v. *Streitwolf,* 181 U. S. 179; *Andrews* v. *Andrews,* 188 U. S. 14," and in the course of his opinion he says further that one of the propositions that may be admitted is: "That the Courts of one State may not grant a divorce against an absent defendant to any person who has not acquired a *bona fide* domicil in that State. The same rule applies if he has removed thither solely for the purpose of acquiring a domicil and obtaining a divorce for a cause, which would have been insufficient in the State from which he removed." In *Thompson* v. *Whitman,* 18 Wall. 457, it is stated in the syllabus: "Neither the constitutional provision, that full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other State, * * * prevents an inquiry into the jurisdiction of the Court by which a judgment offered in evidence was rendered. The record of a judgment rendered in another State may be contradicted as to the facts necessary to give the Court jurisdiction; and if it be shown that such facts did not exist, the record will be a nullity, notwithstanding it may recite that it did exist. Want of jurisdiction may be shown either as to the subject-matter or the person, or, in proceedings *in rem,* as to the thing." And in the case of *Andrews* v. *Andrews,* 188 U. S. 14, the Supreme Court held that the Courts of Massachusetts were not obliged to enforce a decree of divorce obtained in another State as to persons domiciled in Massachusetts and who go into such other State with the purpose of practicing a fraud upon the laws of the State of their domicil; that is, to procure a divorce without obtaining a *bona fide* domicil in such other State. The case of *Keyser* v. *Rice,* 47 Md. 203, and the case of *Miller* v. *Gittings,* 85 Md. 601, while not referring to jurisdiction in divorce cases, are based upon a similar principle to that stated above.

Applying the rule announced by the authorities cited it

would seem clear upon the evidence in this case that the District Court of Nevada proceeded to the decree relied upon by the appellant without jurisdiction. A consideration of the testimony of the plaintiff himself in connection with the undisputed facts of the case can lead the Court to but one conclusion, namely, that he left this State, where he was married and had his domicil, in May, 1913, with the view and for the sole purpose of securing a divorce from the appellee, without any intention of abandoning his domicil in Maryland or of becoming a resident of Nevada for any other purpose, and with a well defined intention to return to this State as soon as his object was obtained. He did not, therefore, acquire a *bona fide* residence or domicil in Nevada, and cannot be said to have "resided" there for six months within the meaning of the statutes in force in that State at the time his bill was filed. Under such circumstances the District Court of Nevada did not acquire jurisdiction to grant him a divorce, and the decree relied upon is the result of a glaring and deliberate fraud upon that Court, and one that this Court, under no construction of the full faith and credit clause of the Federal Constitution, and upon no principle of comity is required to recognize. This is so without regard to any question in reference to the service on the appellee of the summons issued by that Court.

The record contains four exceptions to the evidence, but these are not pressed in this Court, and it is only necessary to say that we see no objection to the evidence referred to in the first, second and third exceptions, and that the evidence objected to in the fourth exception relates to the service of the summons issued by the Nevada Court, which we have not considered in reaching our conclusion.

It follows from what we have said that the decree of the Court below must be affirmed.

> *Decree affirmed, the costs in this Court to be*
> *paid by the appellant.*