FRONA M. AYARES *v.* RICHARD B. AYARES.
[No. 36, October Term, 1932.]

*Decided January 10th, 1933.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, and PARKE, JJ.

*William Purnell Hall* and *Samuel Greenfeld,* for the appellant.

*Abram C. Joseph,* with whom was *Daniel C. Joseph* on the brief, for the appellee.

PATTISON, J., delivered the opinion of the Court.

The appeal in this case is from a decree dismissing the bill of the appellant, Frona M. Ayares, in which she asked that her husband, Richard B. Ayares, the appellee, be required

to pay to her alimony because of his abandonment and desertion of her.

The evidence discloses that the parties were married on March 2nd, 1924. After their marriage, they lived for five years in the upper story of a house the first floor of which was occupied by the parents of the wife. Thereafter they moved to an apartment not far away, which was occupied by them alone. It was while living at the latter place that the separation of the parties occurred, in November, 1931. At that time the family consisted of the husband, the wife, and a seven year old son. The husband's mother was then, and had been for four weeks, a visitor at the home. She was unwell and under the treatment and care of the doctor. Previous to her visit to her son and daughter-in-law, she had lived in an apartment in Atlantic City, and, so far as the record discloses, was self-supporting.

On the morning of the day of the separation there was a discussion between the husband and wife concerning the mother's remaining with them longer. This was described by the husband as a quarrel, though the wife said there was no quarrel, that she had merely complained of his mother's wrongful treatment of her without cause, and that she did not wish her to remain longer with them.

After the incident referred to, the husband left for his place of business, and the wife went out to do some marketing for the dinner of that day. She returned home about eleven o'clock in the morning and thereafter went to the hairdresser, and did not get back until five o'clock in the afternoon. At that time she found her son had returned from school and her mother-in-law had left the house. She was told by the maid that, while she was out, her husband had come home and collected his clothes and those of his mother, and with these both of them had left the house. Upon learning these facts, the wife attempted to communicate with her husband over the telephone at his office. As stated by her: "I started to talk to him but he hung right up. He would not let me say a word. * * * As soon as he heard my voice, he hung right up on me."

The husband refused to pay for certain rugs and other articles purchased from "Stewart's," which were to be paid for by him. As a result thereof, these articles were removed from the house by means of legal proceedings instituted by that company. The defendant had also provided an automobile for the use of his wife, which was kept in a garage near the apartment occupied by them. This he took from the garage, thereby depriving her of its use.

On the third of November, the bill in this case was filed. In it the wife alleged the abandonment and desertion of her by her husband, and her inability to support herself and infant child; also that she was without means with which to pay her attorney or defray the expenses for prosecuting the suit.

It is shown from the evidence that the husband was unusually successful in business, and had, up to the time of the separation, provided well for his wife and child. She spent the summers at Atlantic City, and, while there, her husband was generous in providing the necessary money for her enjoyment. Up to the time of the mother's visit, it may be said that, with the exception of an occasional difference between them, they were kind and affectionate to each other.

The husband, in an effort to justify his conduct in leaving his wife, testified that there were dissensions in the home from the moment his mother arrived. He readily understood that his wife did not want her, and she would say that his mother was not really sick but was lying, and that she did not want her there, and "if I did not like that I could get out with her." This was said to him the evening preceding the day he left, and on the following morning she repeated what she had said the evening before, stating it even more forcibly. The husband also charged his wife with not letting his mother eat at the table with them. As he testified, the cause of his separation was the ill treatment of his mother, and the fact that his wife had ordered him out of the house.

Upon cross-examination, the defendant said that his wife told him, prior to the mother's visit, that she did not want him to bring his mother to the house. He, nevertheless,

permitted her to come. The mother at one time had lived with a brother of the defendant, but as there was some unpleasantness there in connection with her, the mother moved away.

The defendant testified that his troubles with the plaintiff commenced from the day when they became engaged, and these troubles more or less continued, though when asked if his wife was always the cause of the trouble, he said no, that at times it was his fault. When further pressed he admitted that he caused such dissensions as often as she, or, as expressed in the record: "It was about fifty-fifty."

A letter from the defendant to his wife written in August, two or three months before the separation, was offered in evidence. In this letter he addressed her as "Dear Sweetheart" and started off by saying: "Just arrived at the office, and rushed for the typewriter, so that I could get started at once, to write you a long letter, as I promised over the phone. Sweetheart, staying away from you, for a period of two weeks, is quite a punishment, and I am looking forward to this coming Saturday, so that I can jump behind the wheel, and drive to you and Sonny, as I miss the both of you, more than words can describe." He closed the letter with these words: "With best love from a husband, who is still deeply in love with his pretty wife."

The defendant further testified that, on the day of the separation, he left his home about 8.30 in the morning. Around noon he received a telephone call from his mother, who said she was ordered out. The defendant was then asked if he intended leaving his wife when he left the house in the morning. His answer was: "I intended leaving all these years. Q. All the seven years you had been intending leaving? A. Yes. Q. And that morning when you left to go to the office at eight or half past. * * * A. I had the same consideration for our arguments as I always had in the past, with no intentions at all of leaving. I left with the same old story ringing in my ears. When I went to the office I forgot all about it until I heard my mother's voice * * * and

I understood then and there she ordered her out of the house and that was more or less the breaking point."

After he got the telephone message, the defendant went to his home and packed his mother's things, and in his testimony he said: "Knowing my wife did not want me around, I thought the best thing for me to do was to pack up too. Q. Did you leave any word you were leaving? A. Yes, sir. Q. Who with? A. With the maid. Q. And when you left you never intended to return any more, did you? A. That was my feeling at that time. Q. And it is now, isn't it? A. Well, that is to some degree. Q. To what degree? A. Well, I hadn't had any chance, I am not in a position right now until I think matters over."

As already stated, the plaintiff called her husband over the phone on the day of the separation after learning from the maid that he had left, but he refused to talk with her. She called him again on the second night after the separation. This, as it would seem from the record, was before the suit was instituted. He still refused to talk with her, and he explained by saying: "I felt she ordered me out and there was nothing else to do." The plaintiff then offered to prove that, after the institution of the proceedings, she again endeavored to get him to return to her and his son, but this evidence was ruled out by the court below. The defendant's refusal to talk with his wife on the second occasion before the institution of the suit was based, in part at least, upon the fact that she had sought to obtain credit in his name for goods she bought, or attempted to buy, after the separation. The merchants were notified by him not to extend credit in his name and the goods were not delivered. Not only was credit denied her, but he went so far as to permit "Stewart's" to replevy the rugs that were purchased with his knowledge, and which he admitted had been on the floors of their apartment for three weeks prior to the separation.

The defendant testified that he could not say that he and his wife lived happily together, neither could he say they lived unhappily. He stated that she was a "saving sort of woman," and, when asked if his wife's treatment or alleged

treatment of his mother was not the only complaint he had to make against his wife, his answer was: "Well, no, that isn't the only reason, no. Q. Well, tell us what other reason you have for not living with your wife? A. The fact I was ordered out of my own home and there was nothing else for me to do. When the breaking point came I had to go."

Florence Mitchell, the colored maid above referred to, who lived with the parties to this suit at the time of their separation, and who had lived with them before they moved, on October 1st, 1931, to the apartment where the separation occurred, when called by the plaintiff, testified that the parties when living in their former home seemed happy and contented, and "got along all right; once in a while they would have an argument about the child. He corrected it and she would object." Mrs. Ayares, the husband's mother, did not come with them until after they had moved. The husband and wife were all right to that time. The wife treated her husband "all right until his mother came, she did not want his mother there. * * * It was at that time that the unpleasantness started in the apartment." On the morning of the separation Mrs. Ayares "quarreled with Mr. Ayares about his mother," and she ordered him to "get out and take his mother with him"; and when Mrs. Ayares, the wife, came down in the morning she saw her mother-in-law in the sun parlor on the day bed, and she told her "to get out, to get up and get out." And Mrs. Ayares, the mother-in-law, said: "If you want peace I will have peace, and if you want war we will have war," and raised her hand to her. This, the witness stated, was after the younger Mrs. Ayares had quarreled with her and chased her out of the bed. Then the wife went down town, leaving in the apartment the witness and Mrs. Ayares, her mother-in-law. Thereafter, the mother-in-law went to the phone and called her son. Some time later, Mr. Ayares, the husband, came home. At that time the wife had not returned. Mr. Ayares said to the witness: "Florence, get my mother's bags for me. I am going to pack up and take her away. I am leaving also because I can't get along with my wife, I have tried for seven and a half years

and I cannot stand it any longer and I am going while I am a young man." Then he went and got his bags, had them packed by a man he had there, and they left. The witness also said that, when Mrs. Ayares told her mother-in-law "to get out of the house, that she did not want her there, that she was a dirty liar, that she was not sick, and only wanted sympathy, Mrs. Ayares said: 'Yes, if I go, I will take my son with me. * * * And those rugs you have on the floor will come up also.' "

The witness was asked: "Did you call Mr. Ayares in his place of business after he left? A. I did; Mrs. Ayares (his wife) asked me to call him. Q. What did Mrs. Ayares say? A. She told me to call him and ask him if he would let her go down town and buy some clothes for the boy and charge them and send them up to him C. O. D. and he pay for them, he answered me and said, 'No, Florence, tell her no, I can't do that because the lawyers don't want me to do that until the case is over.' Q. How often did you call? A. I called him whenever she asked me to call him because he refused to talk to her. I called him one day and was talking to him something about the blankets that were ordered and she snatched up the receiver from me and he hung up. He did not want any conversation with her."

On cross-examination the witness stated that Mrs. Ayares was very cruel to her mother-in-law; she did not let her lie on the day bed; did not let her have pillows under her head, or the pillows she was permitted to use were small with no covers on them; that she cooked the food for her, but it was not what the other members of the family ate; that the young Mrs. Ayares forbade her from washing the mother's silk underwear and stopped her from cooking for her.

The evidence of this witness as to the unkind treatment by the plaintiff of the mother-in-law, and the harsh language used by the latter in conversation with her, is not found in a sworn statement appearing in the record previously made by the witness while in the employ of the plaintiff, which purported to give the facts known by her relative to this case. This fact in a measure weakens the credibility to which the

witness would otherwise be entitled in respect to such evidence.

The plaintiff in her testimony denied that she told her husband to leave their home or that she wished her husband to leave and take his mother with him. She further denied that she did not permit the mother-in-law to eat at the table with the family, but as stated by her, she "ate at our table until one day she told me the doctor said she would eat at four o'clock and she ate at four, and then went into the living room and then waited until we got through eating. I even asked her to sit at the table with us, but she refused." The plaintiff further testified that, when told of her mother-in-law's contemplated visit to them, the husband said she would be with them for only a week or two. The witness said: "At first I did not mind at all," but "when she started making things uncomfortable for me I told my husband it would be best if she would get her furniture out of storage and take her own apartment and he said he would see to that"; which he never did.

The husband's mother was not called to the stand to testify in the case.

It is shown both by the evidence and the admissions of the defendant that the disagreement between the parties was caused by the presence of the mother in the home, and it was solely because of the disagreements and dissensions so created that the husband left his wife and home. It is true that the defendant attempts to justify his action in part upon the alleged fact that he was told by his wife to leave. If he was so told, which is denied by the wife, it was said in a more or less heated discussion between them in which the wife was complaining of his mother remaining longer with them; and it is evident from his own testimony that the fact that his wife told him to leave in no way caused him to do so, or did it in any way influence him in such action. He said she had a number of times before told him to leave, but he had not left. Nor did it have the effect of disturbing or lessening the love and devotion he had for her, as disclosed by the letter he wrote her only a short time before the separation

It was also said by him that, after reaching his office on the morning of the separation, he thought no more of the fact that she on the same morning had told him to leave. It was out of his mind and was in no sense responsible for his leaving. It was not until his mother called him over the phone and complained to him of his wife's treatment of her that he took any action in the matter. It was what she said to him, arising from the disagreements or dissensions of his mother and his wife, that induced him to take the step he did towards the desertion of his wife and child. It will thus be seen that, if there was any justification for his leaving his wife, it must be found in the disagreements and dissensions caused by the presence of his mother in their home, and the wife's treatment of him resulting therefrom.

It is the settled law of this state that a decree for a permanent alimony may not be granted except upon grounds sufficient to support a decree for a divorce *a vinculo matrimonii* or *a mensa et thoro*. *Simmont v. Simmont,* 160 Md. 422, 153 A. 665; *Outlaw v. Outlaw,* 118 Md. 498, 84 A. 383; *Silverberg v. Silverberg,* 148 Md. 691, 130 A. 325; *Melson v. Melson,* 151 Md. 196, 134 A. 136; *Walker v. Walker,* 125 Md. 649, 94 A. 346; *Polley v. Polley,* 128 Md. 60, 97 A. 526; *Mann v. Mann,* 144 Md. 523, 125 A. 74.

The wife is therefore entitled to alimony if, upon the facts proved, she would be entitled to a divorce, if she were asking for it. Consequently the plaintiff in this case is entitled to alimony if it be shown that the husband left her and remained apart from her with the intention of not returning, without legal justification, for in such case she would be entitled to a divorce.

As was said in *Taylor v. Taylor,* 108 Md. 134, 69 A. 632, 634: "To justify the living apart of a married couple the causes must be grave and weighty, and such as render the performance of marital duties impossible. *Hewitt v. Hewitt,* 1 Bland, 101; *Helms v. Franciscus,* 2 Bland, 568; *Jamison v. Jamison,* 4 Md. Ch. 294; *Schindel v. Schindel,* 12 Md. 315; *Childs v. Childs,* 49 Md. 509; *Hawkins v. Hawkins,* 65 Md. 104, 3 A. 749." The causes assigned in this case

—the disagreements and dissensions of the wife and his mother—for the husband leaving his wife, are not, we think, of that character.

It might be said that a wife, appreciative of her husband's kindness and generosity, would ordinarily be willing to have her mother-in-law visit the home of herself and husband, but this would depend upon the burdens, inconveniences, and the possible unhappiness that might result from the visit, and the existence of these conditions would depend largely upon the disposition of the mother, as well as the wife, and their ability to live agreeably and happily together. It is not for us in this case to say where the fault lay, whether with the wife or the mother-in-law; both may have been in fault. It is shown that the mother-in-law was of a more or less combative disposition, in that she told her daughter-in-law that she was ready for either peace or war. But in any event, wherever the fault may have been, it was, we think, the duty of the husband, upon learning of the relations that existed between his wife and his mother, to have made some arrangement in respect to the latter by which she would not continue to remain in his home. The record discloses that his mother was self-supporting before her illness, but if she were not self-supporting thereafter, because of any extra burdens and expense placed upon her by reason of her illness, the defendant was fully able to help her in her financial needs. Not only was he able, but his brother was equally able. The wife suggested to her husband that his mother take her furniture out of storage and go to her own apartment, and there live apart from them, and thus avoid the causes of dissensions between the husband and wife, who, before her coming into their home, were happy and contented. We may add that it was commendable in the husband to give thought and consideration to his mother, and to wish to alleviate her sufferings and possibly add to her happiness by being associated with him, but if this was to produce the trouble that was produced, then it was better not to have brought her into his home. His wife should have been his

first thought and consideration. If need be, he should have forsaken all others for her.

In our opinion the husband was not legally justified, upon the facts shown to exist in this case, in leaving his wife and living apart from her. The court, we think, erred in refusing a decree for alimony, and for such error the decree of the lower court will be reversed and the case will be remanded for further proceedings in conformity with this opinion.

> *Decree reversed and case remanded for further proceedings in conformity with this opinion, the appellee to pay the costs.*